No. 2021-1572

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

UNILOC USA, INC.; UNILOC LUXEMBOURG S.A.

*Plaintiffs-Appellants*,

v.

APPLE INC.,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of California
No. 3:18-cv-358, Hon. William H. Alsup

## OPENING BRIEF FOR APPELLANTS
## UNILOC USA, INC. AND UNILOC LUXEMBOURG S.A.

James J. Foster
Aaron S. Jacobs
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
(617) 456-8000 (telephone)
(617) 456-8100 (fax)

Jordan A. Rice
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
(312) 450-6700 (telephone)
(312) 450-6701 (fax)

Jeffrey A. Lamken
 *Counsel of Record*
Lucas M. Walker
Kenneth E. Notter III
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000 (telephone)
(202) 556-2001 (fax)
jlamken@mololamken.com

*Counsel for Appellants Uniloc USA, Inc. and Uniloc Luxembourg S.A.*

# REPRESENTATIVE PATENT CLAIM AT ISSUE ON APPEAL

## U.S. Patent No. 6,661,203, Claim 8:

An apparatus for exercising a battery, comprising

> a charging circuit having a charging current output coupled to the battery;

> a temperature sensor positioned to sense a temperature related to the battery temperature;

> a discharging circuit having a discharging current input coupled to the battery; and

> a controller coupled to said temperature sensor, said charging circuit, and said discharging circuit, said controller operable to set said charging current in accordance with said temperature, and operable to set said discharging current in accordance with said temperature, said controller being operable to set said discharging current to zero when said temperature is higher than a first predetermined threshold value.

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 21-1572 |
| **Short Case Caption** | Uniloc USA, Inc. v. Apple Inc. |
| **Filing Party/Entity** | Uniloc USA, Inc.; Uniloc Luxembourg S.A. |

> **Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/25/2021

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken

**FORM 9. Certificate of Interest**

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Uniloc USA, Inc. | Uniloc 2017 LLC | Uniloc Corporation Pty. Ltd. |
| Uniloc Luxembourg S.A. | Uniloc 2017 LLC | None |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☑    Additional pages attached

| Nelson Bumgardner Albritton, P.C.: | Edward R. Nelson, III | Anthony Michael Vecchione |
| --- | --- | --- |
| Prince Lobel Tye LLP: | Kevin Gannon | Brian A. Tollefson |
| Daniel McGonagle | Dean G. Bostock | Matthew David Vella |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☐    None/Not Applicable          ☑    Additional pages attached

| | | |
| --- | --- | --- |
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
| --- | --- | --- |
| | | |
| | | |

# ADDENDUM

## 4.    Legal Representatives (continued)

| Prince Lobel Tye LLP (continued): | Michael James Ercolini | Robert R. Gilman |
|---|---|---|
| Paul J. Hayes | | |

## 5.    Related Cases

By order entered by the Clerk on April 23, 2021, the Court identified the following appeals as companion cases to be assigned to the same merits panel:

| Uniloc USA, Inc. v. Motorola Mobility LLC, No. 21-1555 (Fed. Cir.) | Uniloc 2017 LLC v. Google LLC, Nos. 21-1498, -1500, -1501, -1502, -1503, -1504, -1505, -1506, -1507, -1508, -1509 (Fed. Cir.) (consolidated) | Uniloc 2017 LLC v. Blackboard Inc., No. 21-1795 (Fed. Cir.) |
|---|---|---|

The following appeal, while perhaps not a "related case" within the meaning of this Court's rules, arises from an inter partes review proceeding involving the same patent asserted in this case:

| Uniloc 2017 LLC v. Apple Inc., No. 20-1228, -1229 (Fed. Cir.) | | |
|---|---|---|

The following appeal arises from an unrelated collateral order entered in the same district court action.  By order entered by the Clerk on February 25, 2021, the

Court deconsolidated the current appeal, No. 21-1572, from the following appeal

and the cases with which that appeal was consolidated.

| Uniloc USA, Inc. v. Apple Inc., No. 21-1573 (Fed. Cir.) (consolidated with Nos. 21-1568, -1569, -1570, -1571) | | |
|---|---|---|

# **TABLE OF CONTENTS**

Page

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES....................................................................1

STATEMENT OF THE CASE.......................................................................1

I.     Factual Background ..........................................................................2

       A.     The Problem of Battery Temperature in the Digital Age.....................2

       B.     The Inventors' Innovative Approach for Improving Battery
              Temperature Control ...........................................................4

       C.     Uniloc's Ownership of the '203 Patent ................................7

II.    Procedural History ...........................................................................8

       A.     Uniloc's Infringement Action ................................................8

       B.     The District Court's Initial § 101 Decision ..........................9

       C.     This Court's Decision Vacating and Remanding.................9

       D.     Apple's Motion To Dismiss on Standing Grounds...........10

              1.     The RSA and License Agreement............................10

              2.     The Alleged Event of Default.................................12

       E.     The District Court's Standing Decision .............................13

       F.     Assignment of the Patent to Uniloc 2017 and the Motion To
              Add Uniloc 2017 as Plaintiff.............................................14

       G.     The Present Appeal .............................................................15

SUMMARY OF ARGUMENT ....................................................................15

ARGUMENT ...............................................................................................19

I.      As Owner of the Patent-In-Suit When This Action Was Filed, Uniloc Had Article III Standing To Sue for Infringement .........................................20

II.     Fortress's Putative Right To Sublicense Did Not Deprive Uniloc of Standing ...................................................................................................23

        A.      Apple Cannot Assert Breach of Contracts to Which It Is a Stranger..........................................................................................24

        B.      Another Entity's Ability To License a Patent Does Not Deprive the Patentee of Article III Standing........................................27

                1.      A Patentee Has Standing To Sue Even Where a Third Party Can License the Patent .....................................27

                2.      Principles Governing Jointly Owned Patents Confirm Uniloc's Standing.........................................................29

                3.      The District Court Erroneously Converted an Unsuccessful Affirmative Defense into a Jurisdictional Defect ..............................................................................30

                4.      Uniloc Had Standing Because It Could Forgive Past Infringement ..............................................................31

        C.      The District Court Erroneously Relied on Cases Involving Suits by *Licensees* and *Former Patent Owners*, Not Patent Owners at the Time of Suit...................................................................32

                1.      Cases About Licensee Standing Do Not Govern Uniloc's Standing as Patent Owner .........................................32

                2.      Cases Concerning Transfers of All Substantial Rights Reinforce Uniloc's Standing.......................................36

III.    Uniloc Had Standing Because Any Sublicensing Right Was Extinguished Before Suit Was Filed—and Could Not Release Past Infringement Regardless...................................................................42

        A.      Any Event of Default Was Annulled or Nonexistent Before Uniloc Filed Suit .....................................................................42

B.  Even If Fortress Had Sublicensing Authority Capable of Affecting Standing, Uniloc Could Sue for Past Infringement ............45

IV.  The Patent Claims Patent-Eligible Subject Matter Under § 101 ..................48

A.  The Claims Are Patent-Eligible Under *Alice* Step 1 Because They Provide a Technological Solution to a Technological Problem ................................................................................49

B.  The Claims Recite a Patent-Eligible Application for Purposes of *Alice* Step 2 ....................................................................55

C.  The District Court's Decision Contravenes § 101 Law and Ignores Claim Elements ....................................................57

V.  Uniloc 2017 Should Be Substituted or Joined as Plaintiff ...........................59

CONCLUSION ........................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.L. Smith Iron Co. v. Dickson*,
  141 F.2d 3 (2d Cir. 1944) ................................................................36

*Abbott Labs. v. Diamedix Corp.*,
  47 F.3d 1128 (Fed. Cir. 1995) ........................................................30

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
  No. 16-cv-453, 2017 WL 3668597 (D. Del. Aug. 24, 2017) ............48

*Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*,
  604 F.3d 1354 (Fed. Cir. 2010) .................................................*passim*

*Alice Corp. v. CLS Bank Int'l*,
  573 U.S. 208 (2014)................................................................*passim*

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
  967 F.3d 1285 (Fed. Cir. 2020) ......................................................53

*AntennaSys Inc. v. AQYR Techs., Inc.*,
  976 F.3d 1374 (Fed. Cir. 2020) ..................................................29, 30

*Aspex Eyewear, Inc. v. Miracle Optics, Inc.*,
  434 F.3d 1336 (Fed. Cir. 2006) .................................................*passim*

*Azure Networks, LLC v. CSR PLC*:
  771 F.3d 1336 (Fed. Cir. 2014) ...........................................36, 38, 39
  575 U.S. 959 (2015)...............................................................36, 38
  No. 13-1459, ECF #83 (Fed. Cir. May 29, 2015).............................38
  No. 13-1459, ECF #99 (Fed. Cir. Sept. 14, 2015)...........................38

*Bilski v. Kappos*,
  561 U.S. 593 (2010)........................................................................49

*Bowsher v. Synar*,
  478 U.S. 714 (1986)........................................................................41

*Campbell v. Clinton,*
    203 F.3d 19 (D.C. Cir. 2000) ...............................................31

*Canon Inc. v. Tesseron Ltd.,*
    146 F. Supp. 3d 568 (S.D.N.Y. 2015) ...............................47

*CardioNet, LLC v. InfoBionic, Inc,*
    955 F.3d 1358 (Fed. Cir. 2020) .........................................55

*Chou v. Univ. of Chi.,*
    254 F.3d 1347 (Fed. Cir. 2001) .........................................23

*Coach Servs., Inc. v. Triumph Learning LLC,*
    668 F.3d 1356 (Fed. Cir. 2012) .........................................20

*Davis v. Blige,*
    505 F.3d 90 (2d Cir. 2007) ...................................45, 46, 47

*Diamond v. Diehr,*
    450 U.S. 175 (1981)...................................................*passim*

*Enfish, LLC v. Microsoft Corp.,*
    822 F.3d 1327 (Fed. Cir. 2016) .....................53, 55, 57, 58

*Entick v. Carrington,*
    95 Eng. Rep. 807 (C.P. 1765).............................................22

*Enzo APA & Son, Inc. v. Geapag A.G.,*
    134 F.3d 1090 (Fed. Cir. 1998) .........................................40

*Ethicon, Inc. v. U.S. Surgical Corp.,*
    135 F.3d 1456 (Fed. Cir. 1998) .....................31, 45, 47, 48

*Everdell v. Hill,*
    58 A.D. 151 (N.Y. App. Div. 1901) ...................................24

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,*
    485 N.E.2d 208 (N.Y. 1985)...............................................26

*Independent Wireless Tel. Co. v. Radio Corp. of Am.,*
    269 U.S. 459 (1926).............................................................32

*Intel Corp. v. ULSI Sys. Tech., Inc.*,
  995 F.2d 1566 (Fed. Cir. 1993) ........................................................... 47

*Intellectual Property Development, Inc. v. TCI Cablevision of Cal., Inc.*,
  248 F.3d 1333 (Fed. Cir. 2001) ....................................................... 21, 22

*Keranos, LLC v. Silicon Storage Tech., Inc.*,
  797 F.3d 1025 (Fed. Cir. 2015) ........................................................... 46

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*,
  925 F.3d 1225 (Fed. Cir. 2019) ................................................... *passim*

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................... 21

*Luminara Worldwide, LLC v. Liown Electronics Co.*,
  814 F.3d 1343 (Fed. Cir. 2016) ...................................................... 37, 41

*McCoy v. Mitsuboshi Cutlery, Inc.*,
  67 F.3d 917 (Fed. Cir. 1995) ............................................................. 30

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016) ........................................................... 20

*Molon Motor & Coil Corp. v. Nidec Motor Corp.*,
  946 F.3d 1354 (Fed. Cir. 2020) ...................................................... 33, 35

*Morrow v. Microsoft Corp.*,
  499 F.3d 1332 (Fed. Cir. 2007) ...................................................... 21, 33

*Newell Cos., Inc. v. Kenney Mfg. Co.*,
  864 F.2d 757 (Fed. Cir. 1988) ........................................................... 39

*Ortho Pharm. Corp. v. Genetics Inst., Inc.*,
  52 F.3d 1026 (Fed. Cir. 1995) .................................................. 34, 35, 36

*Oyster Optics, LLC v. Infinera Corp.*,
  843 F. App'x 298 (Fed. Cir. 2021) ..................................................... 47

*Packet Intelligence LLC v. NetScout Sys., Inc.*,
  965 F.3d 1299 (Fed. Cir. 2020) ...................................................... 49, 55

*Parker v. Flook*,
  437 U.S. 584 (1978)..................................................................49

*Premium Mortg. Corp. v. Equifax, Inc.*,
  583 F.3d 103 (2d Cir. 2009) ....................................................26

*Prima Tek II, L.L.C. v. A-Roo Co.*,
  222 F.3d 1372 (Fed. Cir. 2000) ...............................................37

*Propat Int'l Corp. v. Rpost, Inc.*,
  473 F.3d 1187 (Fed. Cir. 2007) .........................................28, 32, 37, 38

*Schering Corp. v. Roussel-UCLAF SA*,
  104 F.3d 341 (Fed. Cir. 1997) ...........................................29, 40, 46, 47

*Schwendimann v. Arkwright Advanced Coating, Inc.*,
  959 F.3d 1065 (Fed. Cir. 2020) ........................................*passim*

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)..................................................................46

*Speedplay, Inc. v. Bebop, Inc.*,
  211 F.3d 1245 (Fed. Cir. 2000) ...............................................37

*Spinelli v. Nat'l Football League*,
  903 F.3d 185 (2d Cir. 2018) ...............................................46, 47

*Synopsys, Inc. v. Mentor Graphics Corp.*,
  839 F.3d 1138 (Fed. Cir. 2016) ...............................................57

*Tenn. Elec. Power Co. v. TVA*,
  306 U.S. 118 (1939)..................................................................22

*Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*,
  482 F.3d 1330 (Fed. Cir. 2007) ...............................................28

*Textile Prods., Inc. v. Mead Corp.*,
  134 F.3d 1481 (Fed. Cir. 1998) ...............................................33

*Thales Visionix Inc. v. United States*,
  850 F.3d 1343 (Fed. Cir. 2017) .........................................50, 54, 55, 58

*Uniloc 2017 LLC v. Blackboard Inc.*,
　　No. 20-cv-665, Dkt. 68 (D. Del. Jan. 10, 2020) ..................................59

*Uniloc USA, Inc. v. ADP, LLC*,
　　772 F. App'x 890 (Fed. Cir. 2019) ............................................*passim*

*Uniloc USA, Inc. v. LG Electronics USA, Inc.*,
　　957 F.3d 1303 (Fed. Cir. 2020) ........................................................55

*Uniloc USA Inc. v. LG Electronics U.S.A. Inc.*,
　　Nos. 18-cv-6737 *et al.*, 2019 WL 690290
　　(N.D. Cal. Feb. 19, 2019) ................................................................60

*Uniloc USA, Inc. v. Samsung Electronics Am., Inc.*,
　　809 F. App'x 863 (Fed. Cir. 2020) ..................................................60

*United States v. Gray*,
　　491 F.3d 138 (4th Cir. 2007) ...........................................................30

*United States v. Jones*,
　　565 U.S. 400 (2012)..........................................................................22

*United States v. Matlock*,
　　415 U.S. 164 (1974)..........................................................................30

*Van v. LLR, Inc.*,
　　962 F.3d 1160 (9th Cir. 2020) ..........................................................20

*Whittemore v. Cutter*,
　　29 F. Cas. 1120 (C.C.D. Mass. 1813)...............................................22

*WiAV Solutions LLC v. Motorola, Inc.*,
　　631 F.3d 1257 (Fed. Cir. 2010) ...........................................32, 33, 34

*Willis v. Gov't Accountability Off.*,
　　448 F.3d 1341 (Fed. Cir. 2006) ................................................21, 28

## Constitutional Provisions

U.S. Const. amend IV ..............................................................................30

U.S. Const. art. III ...........................................................................*passim*

## STATUTES AND RULES

28 U.S.C. § 1295(a)(1) ................................................................1

28 U.S.C. § 1331 ........................................................................1

28 U.S.C. § 1338(a) ....................................................................1

Patent Act ..........................................................................*passim*

    35 U.S.C. § 100(d) ...................................................22, 41, 59

    35 U.S.C. § 101 ...............................................................*passim*

    35 U.S.C. § 154(a)(1) .....................................................*passim*

    35 U.S.C. § 261 ............................................................22, 59

    35 U.S.C. § 271(a) ....................................................22, 30, 35

    35 U.S.C. § 281 ..............................................22, 28, 32, 59

    35 U.S.C. § 284 ..............................................................23

Fed. R. App. P. 42(b) ...............................................................38

Fed. R. App. P. 43(a) ...............................................................59

Fed. R. App. P. 43(b) ...........................................................59, 60

Fed. R. Civ. P. 25(c) .......................................................15, 59, 60

## ADMINISTRATIVE DECISIONS

*Apple Inc. v. Uniloc 2017 LLC*,
    IPR2018-523 (P.T.A.B. Aug. 19, 2019) ...........................7

## OTHER AUTHORITIES

W. Keeton *et al.*, *Prosser and Keeton on Torts* (5th ed. 1984) ................22

*Restatement (Second) of Contracts* ..........................................26

## STATEMENT OF RELATED CASES

There has been a prior appeal in this case before this Court. The title and number of that earlier appeal are: *Uniloc USA, Inc. v. Apple Inc.*, No. 18-2094 (Fed. Cir.). The appeal was decided on August 30, 2019. The panel consisted of Chief Judge Prost and Circuit Judges Plager and Hughes. The opinion was not published in the Federal Reporter, but appears in the Federal Appendix as *Uniloc USA, Inc. v. Apple Inc.*, 784 F. App'x 763 (Fed. Cir. 2019).

The Court has identified the following appeals as companion cases to be assigned to the same merits panel: *Uniloc 2017 LLC v. Google LLC*, Nos. 21-1498, -1500, -1501, -1502, -1503, -1504, -1505, -1506, -1507, -1508, -1509 (Fed. Cir.); *Uniloc USA, Inc. v. Motorola Mobility LLC*, No. 21-1555 (Fed. Cir.); and *Uniloc 2017 LLC v. Blackboard Inc.*, No. 21-1795 (Fed. Cir.).

The following appeals, while perhaps not "related cases" within the meaning of this Court's rules, arise from an inter partes review proceeding involving the patent asserted here: *Uniloc 2017 LLC v. Apple Inc.*, Nos. 20-1228, -1229 (Fed. Cir.).

The following appeal arises from an unrelated collateral order entered in the same district court action: *Uniloc USA, Inc. v. Apple Inc.*, No. 21-1573 (Fed. Cir.) (consolidated with Nos. 21-1568, -1569, -1570, -1571). On February 25, 2021, the Court deconsolidated the current appeal (No. 21-1572) from appeal No. 21-1573 and the cases with which that appeal is consolidated.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). The district court ruled that Uniloc lacked Article III standing and dismissed for lack of jurisdiction; that ruling is the subject of appeal here. The district court entered final judgment on December 4, 2020. Appx1-14. Uniloc timely appealed on January 3, 2021. Appx632-633. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether Uniloc, owner of the patent-in-suit when the complaint was filed, had standing under Article III of the Constitution to sue for infringement.

2.    Whether the district court erred in concluding that Uniloc lacked Article III standing based on the theoretical possibility that Fortress, Uniloc's secured lender, could sublicense the patent-in-suit.

3.    Whether the district court erred in concluding that Fortress could sublicense the patent, including for past infringement, when this suit was filed.

4.    Whether the patent claims patent-eligible subject matter under 35 U.S.C. § 101.

5.    Whether Uniloc 2017 LLC, which acquired the patent-in-suit during this litigation, should be substituted or joined as plaintiff.

## STATEMENT OF THE CASE

This appeal arises from a patent-infringement action brought by Uniloc Luxembourg S.A. ("Uniloc Lux") and its exclusive licensee, Uniloc USA, Inc.—

together, "Uniloc"—in May 2017.[1]  Uniloc owned the asserted patent when the complaint was filed, making it the "patentee" that, under 35 U.S.C. § 154(a)(1), has "the right to exclude others" from practicing the invention.  The district court nonetheless held that Uniloc lacked Article III standing to enforce the patent because Uniloc's secured lender, Fortress, purportedly had a conditional (but never-exercised) right to sublicense the patent.  The court so held even though no party to the relevant agreements—not Uniloc, not Fortress—ever asserted or believed that Fortress had the right to sublicense the patent.  The district court also declared that, if its jurisdictional ruling were overturned, its earlier (but since-vacated) ruling that the claims are invalid under 35 U.S.C. § 101 would be reinstated.

## I.     FACTUAL BACKGROUND

U.S. Patent No. 6,661,203 ("the '203 patent") claims innovative ways of mitigating heat build-up in rechargeable batteries.

### A.     The Problem of Battery Temperature in the Digital Age

In the early 2000s, increased use of rechargeable batteries presented new problems.  Appx59(1:15-18).  When current runs through conductive material, such as circuitry, resistance generates heat.  Appx59(2:13-16).  Heat can cause "deleterious effects" for the battery and nearby components, such as "reduced battery life,

---

[1] Consistent with the decision below, this brief refers to Uniloc Lux and Uniloc USA together as "Uniloc" or "the Unilocs."  *E.g.*, Appx2-3.

reduced battery capacity," "overheating, fire, and chemical leakage." Appx60(4:2-5). Those challenges were exacerbated as increasingly powerful electronic devices demanded increasingly powerful rechargeable batteries. Appx59-60(1:15-17, 4:7-12).

Rechargeable batteries left in "standby" mode can degrade over time, leading to reduced battery life, capacity, or voltage. Appx59(1:61-65). Devices therefore periodically "condition" (or "exercise") rechargeable batteries "by applying an artificial load to discharge the battery to some predetermined level, and then recharge the battery to full charge." Appx59(2:1-4). Ideally, that process is done rapidly so the battery can "be returned to standby operation" or "readied for use" "as quickly as possible." Appx59(2:7-12). But that presented "a dilemma": Higher current levels could ensure fast charging and discharging, but risked "greatly compromis[ing]" battery life and reliability "when temperatures become elevated." Appx59(2:40-44). Conversely, lower current levels mitigated the dangers of higher temperatures, but could render total charge or discharge time "unacceptably long." Appx59(2:46-51).

The prior art addressed the battery-heating problem through techniques such as placing batteries in cooler environments and adding cooling equipment (*e.g.*, fans or heat sinks). Appx59(2:52-57). Those techniques were often bulky, costly, and

complex.  Appx59(2:55-57).  Other proposed solutions included controlling battery current using "charge pulses."  Appx642-643(12:62-13:4, 13:24-42).

## B.    The Inventors' Innovative Approach for Improving Battery Temperature Control

The inventors—Hewlett-Packard engineers—devised a simpler and more cost-effective solution that could easily be integrated with existing batteries.  The inventors developed a circuit design that dynamically adjusts charging and discharging operations based on real-time temperature conditions.  They were awarded the '203 patent.  Appx56-63.

One prior-art smart battery included means for monitoring (though not adjusting) battery temperature.  Appx60(4:50-64).  Figure 1 of the patent, reproduced below, depicts a smart battery (2) (outlined in green) with a thermistor temperature sensor (18).  Appx61(5:16-32).  To that, the inventors added a "controller" (labeled "host (6)," outlined in yellow) and charging circuits (8) (outlined in purple), which are connected to the battery by an SM bus (4) (outlined in red).  Appx61(5:34-60).



*FIG. 1*

Appx57(highlighted).

The invention uses that combination of circuit components—temperature sensor, charging and discharging circuits, and controller—to dynamically adjust current flow in response to temperature signals when "exercis[ing]" a battery. Appx61-62(6:58-7:23). The temperature sensor monitors temperature information (which can reflect not only heat produced by the battery, but also heat from nearby components and ambient conditions) and relays it to the controller, which compares the temperature against a look-up table to determine and set the appropriate current level. Appx61(5:61-6:43); Appx60(4:20-40). For example, when the temperature

5

*exceeds* a predetermined threshold, the controller sets the current to *zero*—shutting off the charging or discharging process. Appx61-62(6:58-7:23). In some embodiments, current is set to *maximum* when the temperature goes *below* a predetermined threshold. Appx60, Appx62(3:14-16, 8:31-34).

Claim 8, asserted here, recites:

An apparatus for exercising a battery, comprising

> a charging circuit having a charging current output coupled to the battery;
>
> a temperature sensor positioned to sense a temperature related to the battery temperature;
>
> a discharging circuit having a discharging current input coupled to the battery; and
>
> a controller coupled to said temperature sensor, said charging circuit, and said discharging circuit, said controller operable to set said charging current in accordance with said temperature, and operable to set said discharging current in accordance with said temperature, said controller being operable to set said discharging current to zero when said temperature is higher than a first predetermined threshold value.

Appx62; *see* Appx62 (claim 15) (reciting that sensor senses temperature of battery and discharging circuit); Appx62 (claim 1) (reciting similar apparatus for charging a battery).

Dependent claims 5 and 13 add a threshold value that allows the current to be set to a *maximum* level when the measured temperature is sufficiently *low*. Appx62;

*see* Appx60(3:14-16). Method claims embody the step-by-step process performed by the devices of the apparatus claims. Appx62-63 (claims 16, 23).[2]

### C. Uniloc's Ownership of the '203 Patent

Plaintiff Uniloc Lux acquired the '203 patent by assignment from Hewlett Packard on May 16, 2017. Appx1; Appx2009-2010, Appx2013.[3] Along with all right, title, and interest in the patent, Uniloc Lux was assigned the right to sue for infringement occurring "prior to, on, or after" assignment. Appx2010(§2.1); *see* U.S. Patent Off., Patent Assignment, https://legacy-assignments.uspto.gov/ assignments/assignment-pat-42435-769.pdf. Uniloc Lux later granted its affiliate Uniloc USA "an exclusive license" authorizing Uniloc USA to practice the invention, as well as the right to sue for infringement. Appx2016-2017(§§1, 5); Appx1. The district court recognized that "Uniloc Luxembourg held title to the '203 patent" when this action was filed. Appx11; *see* Appx65-66(¶8).[4]

---

[2] In inter partes review of the '203 patent, the Patent Trial and Appeal Board upheld some claims (claims 5-6, 20-21), while finding some obvious (claims 1-4, 7-10, 15-19, 22-25, 29); other claims were unchallenged (claims 11-14, 26-28, 30-31). *See* Final Written Decision in IPR2018-523 (P.T.A.B. Aug. 19, 2019). Uniloc's appeal from the IPR is currently stayed pending the Supreme Court's decision in *Arthrex*. *See* No. 20-1228, ECF #51 (Fed. Cir.).

[3] The parties and district court below relied on documents filed in a related action, *Uniloc USA, Inc. v. Apple Inc.*, No. 18-cv-360 (N.D. Cal.). *E.g.*, Appx11. For the Court's convenience, those materials are included in the Appendix.

[4] The '203 patent was assigned to a different entity, Uniloc 2017 LLC, later in the litigation. Uniloc sought to add Uniloc 2017 as plaintiff. *See* pp. 14-15, *infra*.

Before this suit was filed, Uniloc Lux and Uniloc USA entered into several loan and related security agreements with Fortress Credit Co. ("Fortress").  As explained below, those agreements provided Fortress security in the form of a non-exclusive, sublicensable license to Uniloc's patents, which Fortress could exercise only upon an "Event of Default."  Appx496(§ 2.8).  Fortress never asserted an Event of Default or a right to sublicense the '203 patent (or any other Uniloc patent).  *See* Appx7; Appx545(¶ 13).

## II.   PROCEDURAL HISTORY

### A.    Uniloc's Infringement Action

Uniloc—Uniloc Lux and Uniloc USA—filed this action against Apple on May 26, 2017, in the Eastern District of Texas.  Appx64-69.  The case was transferred to the Northern District of California.  Appx1.

The complaint alleged that "Uniloc Luxembourg is the owner, by assignment, of U.S. Patent No. 6,661,203," and that Uniloc USA was its exclusive licensee. Appx65-66(¶¶ 8-9).  The complaint further alleged that Apple infringed the '203 patent by (among other things) making and selling devices with rechargeable batteries that include a temperature sensor that "causes the device to cease charging

when the battery temperature exceeds a threshold level."  Appx66(¶¶10-11); *see* Appx66-68(¶¶12-15).[5]

## B.    The District Court's Initial §101 Decision

In 2018, Apple moved for judgment on the pleadings, arguing that the '203 patent does not claim patent-eligible subject matter under 35 U.S.C. §101.  The district court granted Apple's motion.  Appx15.  Focusing on the patent's Abstract, the district court concluded that the patent is directed to an abstract idea—the "high-level concept of adjusting a battery's current flow based on its temperature"—and does not add a sufficient further inventive step.  Appx17, Appx21.

## C.    This Court's Decision Vacating and Remanding

Uniloc appealed the §101 decision to this Court.  On appeal, Apple argued that Uniloc lacked constitutional standing to sue for infringement at the time it filed suit.  Apple argued that a third party, Fortress, had the ability to sublicense the patent.  Apple did not contend that Fortress had licensed anyone.  In Apple's view, however, Fortress's purported *ability* to sublicense the patent deprived Uniloc of any exclusionary right in the patent and precluded Uniloc from asserting the injury necessary to establish a case or controversy under Article III.  Appx229-231.

---

[5] Uniloc has asserted claims 1, 8, 15-16, and 23.  Appx18.  If the case is remanded, Uniloc anticipates moving to add at least claims 5 and 13.

In light of Apple's standing objection, this Court declined to address the § 101 issue. The Court vacated the district court's judgment and remanded for that court to consider standing in the first instance. Appx233.[6]

### D.    Apple's Motion To Dismiss on Standing Grounds

On remand, Apple moved to dismiss, again asserting that Fortress's putative sublicensing right deprived Uniloc of constitutional standing; Uniloc sought a declaration that the district court had jurisdiction. Those motions concerned two agreements between Fortress and Uniloc—the Revenue Sharing and Note and Warrant Purchase Agreement ("RSA") and the Patent License Agreement ("License Agreement")—central to this appeal.

### 1.    *The RSA and License Agreement*

Uniloc and Fortress entered into the RSA and License Agreement in December 2014, in connection with a loan Fortress made to Uniloc. Appx491-508 (RSA); Appx609-614 (License Agreement); Appx543-544(¶¶3-6). The RSA entitled Fortress to repayment of the loan and part of the revenue generated by Uniloc's patent portfolio. Appx495-497.[7]

---

[6] Apple also argued that Uniloc lacked standing because, during the litigation, Uniloc assigned the patent-in-suit to Uniloc 2017. Appx227, Appx231-232. Uniloc explained that the appropriate response was to add Uniloc 2017 as a party. Appx232. This Court remanded on that issue too; Uniloc then moved to add Uniloc 2017 as plaintiff. Appx233; *see* pp. 14-15, *infra*.

[7] Loan and revenue payments were owed to note "Purchasers." Appx496(§2.7). The initial Purchaser was Fortress. *See* Appx515. The notes were later assigned to

To secure the loan, and "for the benefit of the Secured Parties," the RSA and License Agreement granted Fortress a conditional license to Uniloc's patents. Appx496(§ 2.8); *see* Appx610(§ 2.1). That license was "non-exclusive, transferrable, sub-licensable, divisible, irrevocable, fully paid-up, royalty-free, and worldwide." Appx610(§ 2.1). Consistent with the license's purpose of securing the loan, the agreements provided that Fortress "shall only use such license following an Event of Default." Appx496(§ 2.8); *see* Appx610(§ 2.1).

The RSA defined "Event of Default" to include Uniloc's failure to "perform or observe any of the covenants or agreements contained in Article VI" of the RSA. Appx499(§ 7.1.2(x)); Appx497. The RSA also provided for "[a]nnulment" of an Event of Default where Uniloc "cured such Event of Default to [Fortress's] reasonable satisfaction"; the "Event of Default otherwise ceases to exist"; Fortress "waive[s] such Event of Default in writing"; or Fortress has "entered into an amendment to this Agreement which by its express terms cures such Event of Default." Appx502-503(§ 7.3(x)-(z)); *see* Appx7.

---

or purchased by other Fortress entities, which became "Purchasers"; Fortress continued to serve as collateral agent. Appx515. Like the decision below, this brief refers to all of them as "Fortress." *See, e.g.*, Appx8.

2.    *The Alleged Event of Default*

Fortress never asserted any Event of Default under the RSA or claimed a right

to sublicense the '203 patent.  Appx7.  Apple—which was not a party to the RSA or

License Agreement—insisted that an Event of Default had occurred nonetheless.

According to Apple, Uniloc defaulted in March 2017 by not meeting a

revenue target in RSA Article VI.  Appx7; *see* Appx497(§6.2.2).  That provision

called for Uniloc to "have received at least $20,000,000 in Actual Monetization

Revenues" (*e.g.*, from patent licensing or litigation) during the four fiscal quarters

ending on March 31, 2017.  Appx497(§6.2.2).  Uniloc received approximately $14

million during that period.  Appx7.  Apple argued that, under the RSA, Uniloc's

alleged breach automatically accorded Fortress the right to sublicense the '203

patent to others (authority Fortress never asserted).  Because Fortress purportedly

had licensing authority, Apple insisted, Uniloc lacked the constitutionally minimum

interest necessary to support suit.  Appx11, Appx13.

Uniloc urged that such licensing authority—if it existed—would not deny it

constitutional standing; as owner of the patent, Uniloc could sue regardless.  There

was, moreover, no evidence that Fortress ever asserted or believed that a default had

occurred or that it had authority to sublicense as a result.  To the contrary, James

Palmer, the Fortress Managing Director responsible for the Uniloc loan, submitted

a declaration explaining that "Fortress was satisfied with Uniloc's [monetization]

efforts" and never "regard[ed] Uniloc as in default." Appx544 (¶¶8, 11). Insofar as Uniloc fell short of a revenue target, he explained, that target was "no longer of significance to Fortress" by 2017. Appx544(¶10). Indeed, on May 15, 2017, Fortress—"completely aware of the Actual Monetization Revenues numbers"— "made a substantial *additional* investment" in Uniloc. Appx544-545(¶¶10, 12) (emphasis added). Even assuming there had been an "'Event of Default'" (despite Fortress's contrary view), Palmer explained, that new investment "establishe[d] [that] Uniloc had cured that ostensible 'Event of Default' to Fortress's satisfaction." Appx545(¶12).

### E.    The District Court's Standing Decision

The district court granted Apple's motion to dismiss. Appx1-14. The court did not deny that Uniloc owned the '203 patent at the time of suit. *See* Appx1, Appx11; p. 7, *supra*. The court nonetheless held that Uniloc lacked constitutional standing to sue. The court agreed with Apple that there had been an Event of Default based on a missed revenue target in March 2017, triggering Fortress's right to sublicense Uniloc's patents (including the '203 patent, once Uniloc acquired it in May 2017). Appx7-9. Fortress's ability to sublicense the patent, the court ruled, deprived Uniloc of an exclusionary right in the patents and precluded Uniloc from establishing Article III injury. Appx13.

The district court rejected Uniloc's argument that any ostensible Event of Default had been cured to Fortress's reasonable satisfaction. Appx7-11. The court concluded that "cure" requires an affirmative act "to remedy th[e] default." Appx8, Appx10. In the court's view, Uniloc did not perform such an act. Appx10.

The district court also rejected Uniloc's argument that any sublicensing right was at most *prospective* and thus could not defeat Uniloc's right to sue for infringement occurring before the sublicensing right supposedly arose. Appx13. In the district court's view, the absence of "restrictive language" in the RSA or License Agreement meant that "Fortress's licensing rights operate both prospectively and retrospectively." Appx13.

Although the district court dismissed for lack of subject-matter jurisdiction, it conditionally addressed the merits. If its standing decision were overturned, the court announced, its earlier (but since-vacated) order declaring the '203 patent invalid under § 101 "shall be reinstated." Appx14.

### F.    Assignment of the Patent to Uniloc 2017 and the Motion To Add Uniloc 2017 as Plaintiff

While this case was pending, Uniloc assigned the '203 patent to Uniloc 2017 LLC ("Uniloc 2017"). Appx2002-2004; *see* Appx227.[8] Before the district court

---

[8] Uniloc simultaneously repaid its loan from Fortress, and Uniloc and Fortress mutually agreed to terminate the RSA and License Agreement, including all "rights" the parties held under them. *See* Appx582-583 & n.5; Opening Br. 7-8, *Uniloc 2017 LLC v. Google LLC*, Nos. 21-1498 *et al.*, ECF #19 (Fed. Cir. May 7, 2021).

addressed standing, Uniloc moved to add Uniloc 2017 as plaintiff under Federal Rule of Civil Procedure 25(c).  Appx3, Appx13.  Apple opposed solely on the ground that the request was "moot" because (according to Apple) Uniloc lacked standing when it filed the complaint.  Appx250.  Upon granting the motion to dismiss, the district court denied the motion to add Uniloc 2017 "as moot."  Appx13 (capitalization altered).

### G.    The Present Appeal

Uniloc timely appealed.  Appx632-633.  This Court has identified three other appeals, all raising similar Article III standing questions, as companion cases.  *See Uniloc 2017 LLC v. Google LLC*, Nos. 21-1498 *et al.*; *Uniloc USA, Inc. v. Motorola Mobility LLC*, No. 21-1555; and *Uniloc 2017 LLC v. Blackboard Inc.*, No. 21-1795.

## SUMMARY OF ARGUMENT

**I.**    As patent owner when suit was filed, Uniloc had a constitutionally sufficient interest to sue for infringement: Where a plaintiff alleges it "is the owner by assignment of the [asserted] patent and [that the defendant] infringed that patent," "the court has both the statutory and constitutional authority to adjudicate the matter." *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1071 (Fed. Cir. 2020).

**II.**    Fortress's putative right to sublicense the patent-in-suit did not deprive Uniloc of Article III standing.

**A.**    Apple's standing argument is predicated on breach of a contract to which it is not a party.  As this Court recognized in *Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890 (Fed. Cir. 2019), a stranger to a contract cannot assert breach or invoke contractual remedies where no contracting party has done so.

**B.**    Fortress's putative ability to sublicense the patent could not deprive Uniloc of standing regardless.  A patent owner has standing even where a licensee has a "virtually unfettered right to sublicense." *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006).  General legal principles confirm that.  A *co-owner's* ability to license a patent does not defeat a patentee's constitutional standing to sue.  It follows that a *mere licensee's* ability to sublicense cannot defeat a patentee's constitutional standing either.  Even where a defendant is *actually licensed*, that provides a merits defense; it does not deprive the patentee of standing. *A fortiori*, the *possibility* that a defendant *could* assert a defense, *if* it obtained a license from someone with sublicensing authority, cannot defeat standing.  Uniloc also had standing because it could forgive past infringement.

**C.**    Cases involving *licensee* standing are inapposite.  Here, suit was filed by *the patentee*.  A licensee's exclusionary rights (if any) derive from the license agreement; if the patentee has not promised to exclude a person from practicing the invention (and thus retains the ability to license that person), the licensee is a

*nonexclusive licensee* and cannot sue for infringement. A *patentee's* right to exclude others, by contrast, derives from the patent, not any license agreement.

Where a patentee transfers "all substantial rights" to an exclusive licensee, that can effectively render the licensee the new patent owner. So long as a patentee has not transferred all substantial rights, however, it remains the owner with standing to sue. There is no contention that Uniloc transferred all substantial rights in the patent to Fortress.

**III.A.** Even if Fortress once had a sublicensing right that could affect standing, it was extinguished before Uniloc filed suit. Fortress believed that no Event of Default occurred and that, if one had, it was cured to Fortress's reasonable satisfaction. While the district court reasoned that "cure" required an affirmative act, "cure" under the RSA is anything that meets Fortress's "reasonable satisfaction." And Uniloc's diligent monetization efforts satisfied any affirmative-act requirement regardless.

The district court erroneously deemed the contracting parties' views regarding default and cure irrelevant. Breach and cure are consummate contract issues to be resolved between the contracting parties. Because Fortress attested that any Event of Default was cured to its reasonable satisfaction, that should have ended the matter.

**B.**    At a minimum, Uniloc could sue for infringement occurring *before* Fortress's supposed sublicensing right arose.  Fortress had no authority to retroactively *release* liability for past infringement.

**IV.**    The patent-in-suit claims patent-eligible subject matter under 35 U.S.C. § 101.  Under *Alice* Step 1, the claims are not directed to an abstract idea, but a technological solution to a technological problem: They use circuit components to dynamically adjust rechargeable-battery charging and discharging in response to real-time temperature conditions.  The claims are strikingly similar to those upheld in *Diamond v. Diehr*, 450 U.S. 175 (1981), and satisfy § 101 for the same reasons.

Even under *Alice* Step 2, the claims are patent-eligible because they provide an inventive concept through a specific combination of circuit elements.  While that combination of components *applies* the relationship between temperature and current, the claims embody an improvement to existing ways of regulating battery temperature.  And because the claims are tied to specific circuit components, they do not preempt the relationship between current and temperature or other solutions to the problem of battery temperature.  The district court reached the contrary conclusion by impermissibly fixating on the patent's Abstract, all but guaranteeing the invention would be deemed abstract.

**V.**    During this litigation, the patent-in-suit was assigned to Uniloc 2017. If the Court reinstates this suit, Uniloc 2017 should be substituted as plaintiff.

## **ARGUMENT**

The constitutional requirement of standing derives from Article III of the Constitution and its "case-or-controversy" limitation. *See Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1234 (Fed. Cir. 2019). The gist of standing is whether the plaintiff has alleged sufficient injury to a legally protected interest. *See id.* In a patent-infringement action, this Court has held, the plaintiff alleges sufficient injury—and thus has constitutional standing to sue—where it is "the owner" of the patent that the defendant allegedly infringed. *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1071 (Fed. Cir. 2020).

That principle controls here: As owner of the patent-in-suit when the complaint was filed, Uniloc had constitutional standing to sue for infringement. This Court has never suggested that a patent owner loses constitutional standing to enforce its patents whenever someone else *theoretically* could grant a license. The Court instead has held that patent owners have standing to sue even where a licensee has a "virtually unfettered right to sublicense." Indeed, patent owners have standing even where a defendant has *actually* been licensed by someone else. Licensing is a merits defense, not a bar to standing. The *hypothetical possibility* that Fortress could have granted a sublicense (but never did) cannot defeat Uniloc's standing.

Moreover, Fortress had no sublicensing authority when Uniloc filed suit. Fortress could sublicense only after an Event of Default. Neither Fortress nor any

other party to the RSA believed an Event of Default actually occurred. That precludes Apple—a stranger to the RSA—from asserting the RSA was breached. Fortress, moreover, was unequivocal that, *if* any Event of Default occurred, it was cured to Fortress's "reasonable satisfaction" before Uniloc filed suit—as evidenced by Fortress's attestation and its substantial new investment in Uniloc after the supposed "default." And Fortress could not forgive past infringement regardless.

The district court's earlier ruling that the patent is invalid under § 101—which the court declared would be reinstated if its standing ruling is overturned—likewise cannot be sustained. And because the patent-in-suit has now been assigned to Uniloc 2017, Uniloc 2017 should be substituted or joined as plaintiff.

Standard of Review. Standing is a question of law reviewed *de novo*. *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1376 (Fed. Cir. 2012); *Van v. LLR, Inc.*, 962 F.3d 1160, 1161-62 (9th Cir. 2020). Patent eligibility under § 101 is reviewed *de novo*, as is the propriety of judgment on the pleadings. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1311 (Fed. Cir. 2016).

## I.    AS OWNER OF THE PATENT-IN-SUIT WHEN THIS ACTION WAS FILED, UNILOC HAD ARTICLE III STANDING TO SUE FOR INFRINGEMENT

"As long as a plaintiff alleges facts that support an arguable case or controversy under the Patent Act, the court has both the statutory and constitutional authority to adjudicate the matter." *Schwendimann*, 959 F.3d at 1071. A plaintiff satisfies that condition where it alleges that it "*is the owner by assignment of the*

*[asserted] patent* and [that the defendant] infringed that patent." *Id.* (emphasis added). "[T]itle in the patent" thus "confers constitutional standing on the [patentee] to sue another for patent infringement in its own name." *Intellectual Property Development, Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001); *see Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*, 604 F.3d 1354, 1359 (Fed. Cir. 2010); *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007).

Under those principles, Uniloc had standing. It alleged—and showed—that it owned the '203 patent when the complaint was filed on May 26, 2017. Appx11; Appx65-66(¶¶8-9); Appx2009-2010, Appx2013, p. 7-8, *supra*. Uniloc also alleged that Apple infringed the patent. Appx66-68(¶¶10-15). Under this Court's precedents, no more is needed.

That makes sense. Article III standing exists where the plaintiff suffers a "concrete" and "particularized" injury to a "legally protected interest." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Such an interest may exist "'by virtue of statutes creating legal rights, the invasion of which creates standing.'" *Willis v. Gov't Accountability Off.*, 448 F.3d 1341, 1344 (Fed. Cir. 2006); *see Intellectual Property*, 248 F.3d at 1345 ("Standing in a patent infringement case is derived from the Patent Act"). The Patent Act "grant[s] to the patentee"—including successors-in-title like Uniloc—"the right to exclude others from making, using, offering for

sale, or selling the invention throughout the United States." 35 U.S.C. § 154(a)(1); *see* §§ 100(d), 261.[9]  That exclusionary right is invaded—*i.e.*, it is "infringe[d]"— when someone "makes, uses, offers to sell, or sells [the] patented invention" in this country "without authority." § 271(a).  Here, Apple invaded Uniloc's rights under § 154(a)(1) by practicing the patented invention "without authority." § 271(a); *see Lone Star*, 925 F.3d at 1234 ("[T]hose who possess 'exclusionary rights' in a patent suffer an injury when their rights are infringed.").  For centuries, property owners like patentees have been able to bring suit for such invasions.[10]

The Patent Act, moreover, provides Uniloc an express cause of action: "*A patentee* shall have remedy by civil action for infringement of his patent." § 281 (emphasis added).  Because Uniloc was a patentee alleging infringement of its patent, the district "court ha[d] both the statutory and constitutional authority to adjudicate the matter." *Schwendimann*, 959 F.3d at 1071.

---

[9] One can become patentee (*i.e.*, patent owner) by virtue of an express assignment of the patent, or by virtue of an exclusive license that transfers "all substantial rights" in the patent. *Mann*, 604 F.3d at 1359-60.  "A grant of all substantial rights in a patent amounts to an assignment—that is, a transfer of title in the patent—which confers constitutional standing on the assignee to sue another for patent infringement in its own name." *Intellectual Property*, 248 F.3d at 1345; *see* pp. 36-41, *infra*.

[10] *See Tenn. Elec. Power Co. v. TVA*, 306 U.S. 118, 137-38 (1939) ("inva[sion]" of "property" right supports suit); *United States v. Jones*, 565 U.S. 400, 405 (2012) (citing *Entick v. Carrington*, 95 Eng. Rep. 807, 817 (C.P. 1765)); *Whittemore v. Cutter*, 29 F. Cas. 1120, 1121 (C.C.D. Mass. 1813) (Story, J.) (patentee may sue for infringement even absent actual damages); W. Keeton *et al.*, *Prosser and Keeton on Torts* 67, § 13 (5th ed. 1984).

Uniloc also suffered economic harm that provided a constitutionally sufficient "injury-in-fact." *Chou v. Univ. of Chi.*, 254 F.3d 1347, 1359 (Fed. Cir. 2001). "[D]epriv[ation] of an interest in proceeds from licensing [an] invention" is injury-in-fact. *Id.* Uniloc was entitled to a reasonable royalty for the right to practice its invention. *See* 35 U.S.C. § 284; Appx68. Apple's unlicensed infringement deprived Uniloc of those royalties.

## II. FORTRESS'S PUTATIVE RIGHT TO SUBLICENSE DID NOT DEPRIVE UNILOC OF STANDING

The district court recognized that the '203 patent was assigned to Uniloc on May 16, 2017, and that Uniloc held title when it filed suit on May 26, 2017. Appx1, Appx11. The court ruled, however, that Uniloc lacked standing because its secured lender, Fortress, allegedly obtained a (never-exercised) right to sublicense the patent following an alleged Event of Default under the RSA. Appx7-14. That was error for at least three reasons. First, no contracting party has asserted an Event of Default; Apple cannot assert breach or invoke remedial provisions of contracts to which it was a stranger. *See* Section II.A. Second, a licensee's ability to sublicense cannot deprive a patentee of standing to enforce its own patent. *See* Sections II.B-C. Third, any sublicensing right Fortress allegedly had was extinguished before this action was filed; nor could it release past infringement. *See* Section III.

### A.    Apple Cannot Assert Breach of Contracts to Which It Is a Stranger

Apple contends that an Event of Default under the RSA—a contract between Uniloc and Fortress—gave Fortress the right to sublicense the patent-in-suit. *See* Appx7-11. But it is undisputed that Fortress never asserted an Event of Default or claimed a right to sublicense the patent. Appx7. The contracting parties agree there was never an Event of Default. *See* pp. 12-13, *supra*. Apple, as a "mere stranger" to the RSA and License Agreement, "cannot claim the benefit" of an alleged breach and remedial provisions that no party to the contracts has invoked. *Everdell v. Hill*, 58 A.D. 151, 157-58 (N.Y. App. Div. 1901).[11]

This case is indistinguishable from *Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890 (Fed. Cir. 2019), where defendants unsuccessfully sought to dismiss a Uniloc lawsuit on virtually identical grounds. The defendants alleged that a default under an agreement between Uniloc and IBM "automatically triggered" a provision that "gave IBM the right to 'license'" the patents-in-suit. *Id.* at 894. Like Apple here, the defendants urged that "Uniloc thus could no longer wholly exclude [the defendants] from practicing the patents" and "lacked constitutional standing." *Id.*

This Court rejected that argument. The defendants "predicated [their argument] on the existence of a breach of the 2016 Uniloc-IBM Agreement." *ADP*, 772 F. App'x at 895. But they "ha[d] not shown that *IBM . . . considers Uniloc to be in*

---

[11] New York law governed the RSA and License Agreement. Appx7.

24

*breach or has asserted a right to sublicense and release [defendants] from liability relating to the patents-at-issue*." *Id.* (emphasis added).  As neither "parties to the Agreement" nor "intended beneficiaries of the contract," the Court held, the defendants could not invoke a breach the contracting parties did not themselves recognize. *Id.*

That reasoning applies here.  Apple has not shown that Fortress "considers Uniloc to be in breach or has asserted a right to sublicense and release [Apple] from liability relating to the paten[t]-at-issue." *ADP*, 772 F. App'x at 895.  Indeed, Fortress was *satisfied* with Uniloc's performance under the RSA, did *not* consider it in breach, and did *not* assert any right to sublicense the patent.  *See* pp. 12-13, *supra*. As neither a party nor an intended beneficiary of the RSA or License Agreement, Apple cannot gin up an alleged breach of those agreements to escape suit.

The district court attempted to distinguish *ADP* on the ground that IBM's interest was "'reversionary,'" whereas Fortress was "*already granted*" a "right to . . . sublicense," subject only to "the limitation that Fortress would not *use* the right until an Event of Default."  Appx12-13.  But IBM *also* had been "already granted" a license with right to sublicense.  *See Uniloc USA, Inc. v. ADP, LLC*, No. 18-1132, ECF #82 at 36, §2.1 ("IBM reserves and retains, and *[Uniloc] hereby grants to IBM*," a "license [that] includes the right to grant . . . sublicenses" (emphasis added)). Like Fortress here, IBM could *use* that right only "if" Uniloc breached.  *Id.* §2.1(e);

*see ADP*, 772 F. App'x at 895.  And, like here, IBM's sublicensing right was allegedly "automatically triggered" upon breach.  *ADP*, 772 F. App'x at 894.

The district court protested that standing cases often require review of licensing agreements to which the defendants are not parties.  Appx13.  But none of the cases it cited involved licensing rights contingent on an alleged *breach of contract* that no contracting party had recognized.  In *that* situation, the law is clear that a "non-party to a contract"—like Apple and the *ADP* defendants—"lacks standing to enforce the agreement in the absence of terms that 'clearly evidence[ ] an intent to permit enforcement by the third party' in question." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 485 N.E.2d 208, 212 (N.Y. 1985)).  Such terms are wholly absent here.

The district court's approach defies fundamental freedom-of-contract principles.  "The breach of a contract potentially involves disputes of materiality, potential opportunities to cure, and available remedies, all of which are *consummate contract issues to be resolved between the parties*." *ADP*, 772 F. App'x at 895 (citing *Restatement (Second) of Contracts* §§ 225, 229, 241-242, 246) (emphasis added).  Apple, a stranger to the contracts, would wrest those matters out of the contracting parties' hands—against their wishes—and wield them for its own benefit.  Unsurprisingly, this Court in *ADP* was not aware of "any case where a non-

beneficiary third party has asserted a breach of a contract that successfully triggered remedial provisions in the contract."  772 F. App'x at 895.

## B.  Another Entity's Ability To License a Patent Does Not Deprive the Patentee of Article III Standing

Even if Fortress had a never-claimed and never-exercised sublicensing right, that would not deprive the patent owner—Uniloc—of Article III standing.  This Court's decision in *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336 (Fed. Cir. 2006), forecloses the district court's contrary ruling.

### 1.  *A Patentee Has Standing To Sue Even Where a Third Party Can License the Patent*

In *Aspex*, as here, the plaintiff "was the owner of the [asserted] patent when the original complaint was filed."  434 F.3d at 1337-38.  In *Aspex*, as here, the defendant urged that a licensee had a "virtually unfettered right to sublicense" the patent.  *Id.* at 1342.  In *Aspex*, the Court held that the sublicensing right did not defeat the patentee's standing: Instead, "[t]he essential issue regarding the right to sue on a patent is *who owns the patent*."  *Id.* at 1341 (emphasis added).  Because the plaintiff "was the owner of the patent when the complaint was filed," the plaintiff was "entitled to sue."  *Id.* at 1343; *see id.* at 1337-38 (plaintiff "was the owner of the [asserted] patent when the original complaint was filed, and thus . . . had standing to sue").  Likewise here, Uniloc was the owner of the patent when the complaint was filed and thus had standing to sue.

The district court appears to have believed *Aspex* inapplicable because, in its view, the case concerned "statutory" rather than Article III standing. Appx12. But Article III standing cannot be "waived" or "assumed"; because it is jurisdictional, this Court has "an independent obligation to examine Article III standing even if the issue was not raised." *Willis*, 448 F.3d at 1343-44. Statutory or prudential standing can impose a *higher* bar than Article III's constitutional minimum, but cannot create a justiciable case or controversy where none otherwise exists. *See Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1338 (Fed. Cir. 2007). This Court could not have allowed *Aspex* to proceed unless Article III was satisfied.

Besides, it is well settled that even an *exclusive licensee* has *Article III* standing to sue for infringement. *See Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1193 (Fed. Cir. 2007). An exclusive licensee lacks *statutory* standing to sue in its own name, because 35 U.S.C. §281 gives only the "patentee" a cause of action; an exclusive licensee thus must join the patentee as a plaintiff. *See id.* at 1189, 1193. Where (as here) the plaintiff is the *patentee*, however, both standards are necessarily met: So long as the plaintiff alleges that it "is the owner by assignment of the . . . patent and [that the defendant] infringed that patent," "the court has both the statutory and constitutional authority to adjudicate the matter." *Schwendimann*, 959 F.3d at 1071.

2.     *Principles Governing Jointly Owned Patents Confirm Uniloc's Standing*

Principles governing jointly owned patents make Uniloc's standing clearer still. Each co-owner of a patent may unilaterally license the patent to whomever it wishes. *Schering Corp. v. Roussel-UCLAF SA*, 104 F.3d 341, 344-45 (Fed. Cir. 1997). But a co-owner's right to license a patent does not defeat another owner's *Article III standing*. To the contrary, each co-owner has independent Article III standing to sue for infringement. *See id.* at 345 (co-owner's "right to license is not incompatible with [another co-owner's] unilateral right to sue"); *AntennaSys Inc. v. AQYR Techs., Inc.*, 976 F.3d 1374, 1376-78, 1381 (Fed. Cir. 2020). This Court has held that a patent owner has Article III standing even if another owner *actually* "authorized [the defendant] to practice the [asserted] patent as a licensee." *AntennaSys*, 976 F.3d at 1378. Actual licensing is a merits defense, not a barrier to standing. *Id.*

If a co-owner's *actual* licensing of the defendant cannot defeat Article III standing, the *hypothetical possibility* that a nonexclusive licensee like Fortress could grant a license cannot defeat standing either. A patentee does not lose constitutional standing to enforce its patent simply because another entity, whether co-owner or licensee, supposedly could license the patent as well.[12]

---

[12] While all *co-owners* generally must be joined as plaintiffs in an infringement suit, that requirement is "not jurisdictional in nature" and "does not impact [a patentee's]

That reflects general principles.   Under the Fourth Amendment, each co-owner or co-occupant of a property has standing to object to unauthorized intrusion, even when someone else with "common authority over . . . the premises or effects" theoretically could consent to entry or search.  *United States v. Matlock*, 415 U.S. 164, 171 (1974); *see United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007) (collecting cases).   The fact that multiple people can license entry does not vitiate the fact that entry remains unlicensed when no one consents.   No less is true here: The hypothetical possibility that someone else *could* license the patent does not prevent the patentee from enforcing its exclusionary rights against those who practice the invention "*without* authority."   35 U.S.C. § 271(a) (emphasis added).

### 3.   *The District Court Erroneously Converted an Unsuccessful Affirmative Defense into a Jurisdictional Defect*

Even where a defendant has *actually been licensed* to practice an invention, that does not deprive the patentee of Article III standing.  Instead, a license provides "an *affirmative defense* to a claim of patent infringement."  *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995) (emphasis added).  Such a defense is "not jurisdictional in nature."  *AntennaSys*, 976 F.3d at 1378.

---

*Article III* standing."  *AntennaSys*, 976 F.3d at 1378 (emphasis added).  Regardless, that requirement is inapplicable here, as Uniloc was sole owner of the patent-in-suit. And even if Fortress were somehow a co-owner—which it was not, and which no one has argued—the solution would have been joining Fortress as a plaintiff, not dismissal.  *See Lone Star*, 925 F.3d at 1236; *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1133 (Fed. Cir. 1995).

Here, Apple does not contend that it *actually* received a license that could support a defense on the merits. It argues that Uniloc lacked Article III standing because Apple *theoretically* could have mounted an affirmative defense *if* it had received a license from Fortress. That theory does not merely "conflat[e] standing with the merits." *Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000). It conflates truth with imagination: It attempts to defeat standing by imagining facts that could support a license defense. It would allow infringers to escape liability based on the speculative possibility that they *might have* asserted a merits defense *if* they had obtained a license they never obtained—effectively recasting a *losing* merits defense as a *winning* jurisdictional defense. Nothing supports that result.

4.    *Uniloc Had Standing Because It Could Forgive Past Infringement*

Article III standing also exists where plaintiffs can "'forgive'" infringement. *Lone Star*, 925 F.3d at 1234. "[T]hose who possess 'exclusionary rights' in a patent suffer an injury when their rights are infringed." *Id.* Exclusionary rights include the ability "to 'forgive activities that would normally be prohibited under the patent statutes.'" *Id.* As "sole owner" of the patent-in-suit, Uniloc could forgive past infringement by releasing infringers from liability. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1467 & n.8 (Fed. Cir. 1998); *see* Appx238-239; Appx570. For that reason too, Uniloc has standing.

The district court did not dispute that Uniloc could forgive past infringement "'that would normally be prohibited under the patent statutes.'" *Lone Star*, 925 F.3d at 1234. It objected that Fortress could also retroactively license (*i.e.*, release) past infringement. Appx13. But nothing in *Lone Star* or this Court's precedents makes that dispositive of a patentee's standing. And, as discussed below, Fortress did *not* have the right to grant retroactive licenses or releases. *See* pp. 45-48, *infra*.

## C. The District Court Erroneously Relied on Cases Involving Suits by *Licensees* and *Former Patent Owners*, Not Patent Owners at the Time of Suit

The district court's decision rested on actions brought by *licensees* or *former patent owners*, not the patent's owner at the time of suit. Those cases are governed by wholly different principles.

### 1. *Cases About Licensee Standing Do Not Govern Uniloc's Standing as Patent Owner*

As the "patentee," Uniloc has the "right to exclude" under 35 U.S.C. §154(a)(1), and an express cause of action against infringers under §281. The district court, however, invoked precedent addressing whether an entity claiming to be an *exclusive licensee* had standing. *See* Appx6, Appx11 (citing *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1266 (Fed. Cir. 2010)). An "exclusive licensee has a sufficient interest in the patent to have standing to sue under Article III" (although it must join the patent owner because it is not a "patentee" authorized to sue under §281). *Propat*, 473 F.3d at 1193; *see Independent Wireless Tel. Co. v.*

*Radio Corp. of Am.*, 269 U.S. 459 (1926).  But a *nonexclusive* licensee—holding only a "bare" license—cannot sue for infringement.  *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 946 F.3d 1354, 1360-61 (Fed. Cir. 2020).

Because of that distinction, courts often examine the "terms of [license] agreement[s]" to determine whether a license is exclusive.  *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998).  If the agreement includes " 'the patent owner's promise that others' " (including the alleged infringer) " 'shall be excluded from practicing' " the invention, the licensee is an "exclusive licensee." *Id.*  An exclusive licensee is considered to " 'shar[e] the property rights represented by a patent' " and possess an exclusionary "interest in the patent sufficient to establish an injury when a third party infringes, *akin to an ownership interest*."  *Molon*, 946 F.3d at 1361 (emphasis added).

By contrast, if the patentee has *not* promised to exclude others from practicing the invention—if the license agreement leaves the patentee "free to grant licenses to others," including the accused infringer—the license is *nonexclusive* and the licensee lacks an exclusionary interest in the patent.  *Textile Prods.*, 134 F.3d at 1484; *see Morrow*, 499 F.3d at 1341-42 (finding plaintiff lacked standing where it "lack[ed] an exclusive license" and patentee "could grant an exclusive license to any party").  This Court thus explained in *WiAV* that a licensee "lacks standing to sue a party who

has the ability to obtain . . . a license from another party with the right to grant it." 631 F.3d at 1266.

The district court believed that principle—that a "'*licensee* lacks standing to sue a party who has the ability to obtain . . . a license from another'"—could be stretched to cases where *the patentee* brings suit. Appx11 (quoting *WiAV*, 631 F.3d at 1266) (emphasis added). That was error. "[A]n *exclusive licensee* derives its standing from the exclusionary rights it holds" under its licensing agreement—from "'the patentee's . . . promise that others [including the alleged infringer] shall be excluded from practicing the invention.'" *WiAV*, 631 F.3d at 1266 (emphasis added). That promise is what brings the licensee within "'the monopoly of the patent.'" *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1031 (Fed. Cir. 1995); *see WiAV*, 631 F.3d at 1266-67. The licensee's exclusionary rights thus are violated only where the defendant practices the invention *despite the patentee's agreement* that it will not be allowed to practice the invention. *WiAV*, 631 F.3d at 1266-67. Where the patentee has reserved the right to license the defendant, however, that agreement—and thus the exclusionary right the licensee needs to be able to sue—is absent.

The *patentee's* exclusionary rights, however, do not derive from a license agreement. They flow directly from the patent, which "grant[s] to the patentee . . . the right to exclude others" from practicing the invention. 35 U.S.C. § 154(a)(1).

34

That exclusionary right is not merely "*akin* to an ownership interest," *Molon*, 946 F.3d at 1361 (emphasis added)—it *is* an ownership interest. That interest is invaded, and gives the patentee standing to sue, whenever someone practices the invention "without authority." § 271(a). That is why "[t]he essential issue regarding the right to sue on a patent is *who owns the patent*." *Aspex*, 434 F.3d at 1341-42 (emphasis added). That is why a plaintiff has Article III standing to sue for infringement where it alleges it is "the owner by assignment of the [asserted] patent." *Schwendimann*, 959 F.3d at 1071. That is why a patentee may sue *even if* another person has a "virtually unfettered right to sublicense" the patent-in-suit. *Aspex*, 434 F.3d at 1341-42; *see* pp. 27-28, *supra*. And that is why Uniloc had standing to sue here.

A nonexclusive licensee lacks standing because it "'has no property interest in the monopoly of the patent, nor any contract with the patent owner that others shall not practice the invention.'" *Ortho*, 52 F.3d at 1031. A patent owner, however, has a "'property interest in the monopoly of the patent'"—*it owns the patent*. *Id.* Moreover, nonexclusive licensees historically have been denied standing *to protect patent owners*. Quoting Judge Learned Hand, this Court has explained:

> "The reason why [the licensee] is not permitted to sue is not because he has nothing to protect. But against that interest is the interest of the infringer to be immune from a second suit by the owner of the patent; and also *the interest of the patent owner to be free to choose his forum* .... Indeed, *the owner may have granted a number of licenses, and it would be exceedingly oppressive to subject him to the will of all his licensees*. These two interests in combination have been held to overweigh any interest of the licensee."

*Id.* (quoting *A.L. Smith Iron Co. v. Dickson*, 141 F.2d 3, 6 (2d Cir. 1944)) (ellipsis in original) (emphasis added).  The justifications for denying nonexclusive licensees standing to sue—lack of a property interest in the patent, avoiding a separate infringement suit by the patent owner, and protecting the patent owner's interests— are wholly absent when the patentee itself brings suit.  Yet the district court effectively equated a patentee like Uniloc with a mere *nonexclusive licensee*.  That cannot be sustained.

> 2.  *Cases Concerning Transfers of All Substantial Rights Reinforce Uniloc's Standing*

Other cases cited by the district court involved alleged transfers of "all substantial rights" in a patent.  *See* Appx11 (citing *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1344 (Fed. Cir. 2014), *judgment vacated on other grounds*, 575 U.S. 959 (2015); *Mann*, 604 F.3d at 1362).  Transferring "all substantial rights" in a patent to an exclusive licensee is considered "tantamount to an assignment of the patent to the exclusive licensee." *Mann*, 604 F.3d at 1359.  In that situation, "*the licensee becomes the owner* of the patent for standing purposes and gains the right to sue on its own." *Id.* at 1359-60 (emphasis added).  If the agreement does *not* transfer all substantial rights, however, "the licensor remains the owner of the patent and retains the right to sue for infringement." *Id.* at 1359.  Here, the district court nowhere found that Uniloc had transferred all substantial rights in the patent to Fortress, and correctly so.

When determining whether an exclusive license transferred "all substantial rights" in a patent, the "licensee's right to sub-license" may be relevant. *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1380 (Fed. Cir. 2000). For example, the right to practice a patent, without the right to license others, may fall short of making one the patent's "owner." But this Court has never suggested that granting a right to sublicense itself effectively transfers ownership. One must "examine the 'totality' of the agreement" to determine whether the licensee "obtained *all* substantial rights in the patent." *Lone Star*, 925 F.3d at 1229 (emphasis added). No matter how significant some rights seem, if "the licensor did not transfer '*all* substantial rights,'" "the licensor remains the owner of the patent and retains the right to sue for infringement." *Mann*, 604 F.3d at 1359 (emphasis added).

The right to sublicense is only part of the all-substantial-rights analysis. For example, in *Luminara Worldwide, LLC v. Liown Electronics Co.*, 814 F.3d 1343, 1350-51 (Fed. Cir. 2016), the Court considered the licensee's "sole right to sublicense the asserted patents" as one of many factors supporting the conclusion that the licensee held "all substantial rights to the patent[s]" and effectively became the patentee. In *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1251-52 (Fed. Cir. 2000), the Court cited a right to sublicense—among other rights—as evidence that a licensee had "all substantial rights." In *Propat*, by contrast, the licensee did *not* have "all substantial rights" in the patent *despite* having the right "to license the

patent to third parties." 473 F.3d at 1190. And in *Aspex*, the Court held that a patentee had *not* transferred "all substantial rights" to a licensee—and thus remained "the owner of the patent . . . entitled to sue"—even though it had given the licensee a "virtually unfettered right to sublicense." 434 F.3d at 1342-43.

The district court appears to have interpreted *Azure*, 771 F.3d 1336, as holding that a licensee's ability to sublicense deprives a patent owner of standing. *See* Appx11. That was doubly mistaken. First, *Azure* was vacated by the Supreme Court, *see* 575 U.S. 959, and never reinstated, *see Azure Networks, LLC v. CSR PLC*, No. 13-1459, ECF #83 at 2 (Fed. Cir. May 29, 2015) (recalling mandate and ordering supplemental briefing); *id.* ECF #99 (Fed. Cir. Sept. 14, 2015) (dismissing appeal under Fed. R. App. P. 42(b)). Second, consistent with the precedents above, *Azure* considered "freedom to sublicense" as just one of many "factors" supporting a conclusion that the original patent owner (Tri-County) had transferred "all substantial rights" to its exclusive licensee (Azure), rendering Azure the new "effective owner" and depriving Tri-County of standing. 771 F.3d at 1344, 1347.

The district court invoked *Azure*'s passing remark that the "logic" of the rule that "a nonexclusive license confers no standing *on the licensee* because the licensee does not have a legally protected interest conferred by the Patent Act" applies "even if it is *the patent owner* holding the nonexclusive right and the licensee holds the exclusionary rights." 771 F.3d at 1344 (some emphasis added) (cited Appx11). But

the district court failed to appreciate that statement's context. The "patent owner" it referred to was the *former* patent owner (Tri-County), which had "transferred all substantial rights" in the patent and thus had not "retained ownership." *Id.* at 1347. Nothing in *Azure* purported to—or could—displace the Court's earlier holding in *Aspex* that a patentee that does *not* transfer all substantial rights retains the right to sue, even if a licensee can sublicense. *See Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988) (in event of conflict, "the precedential decision is the first").

The district court misread *Mann* as suggesting that "[a] patent licensee's right to grant an unencumbered sublicense renders even the *patent owner's* right to exclude (and, thus, to sue) illusory." Appx11 (citing *Mann*, 604 F.3d at 1362). *Mann* concerned whether a patentee had transferred "all substantial rights" to an exclusive licensee, thereby rendering the licensee the new patentee. 604 F.3d at 1359-62. In that context, it was relevant whether the licensee could freely sublicense any defendant the licensor might sue: That could suggest the exclusive licensee had the right "to bring suit and to control litigation," one of the "substantial rights" underlying the all-substantial-rights analysis. *Mann*, 604 F.3d at 1362. The Court's description of control over litigation as involving the licensee's ability to render the licensor's right to sue "illusory" was shorthand for who ultimately held the reins. *Id.* The Court did not—and could not—purport to overturn precedent holding that

another person's "right to license" a defendant "does *not* render the [patent owner's] right to sue illusory." *Schering*, 104 F.3d at 345 (emphasis added). To the contrary, *Mann* made clear that any patentee who does *not* transfer *all* substantial rights in a patent "remains the owner of the patent and retains the right to sue for infringement." 604 F.3d at 1359; *see Aspex*, 434 F.3d at 1341-43 (patentee who did not transfer all substantial rights retained standing to sue despite licensee's "virtually unfettered right to sublicense").

The district court suggested there could be *no* patentee with the right to sue. Appx11. But *Mann* is explicit: If "the licensor did not transfer 'all substantial rights' to [an] exclusive licensee, . . . *the licensor remains the owner* of the patent and *retains the right to sue* for infringement." 604 F.3d at 1359 (emphasis added). In urging otherwise, the district court misconceived the "all substantial rights" inquiry. The question is not, as the district court thought, "whether the patent owner *still held* . . . 'all substantial' . . . rights," Appx11 (emphasis added), but whether the patent owner "*transfer[red]* 'all substantial rights'" to someone else, *Mann*, 604 F.3d at 1359-60 (emphasis added). "Any less than a complete transfer of these rights is merely a license, in which case the title remains with the owner of the patent and the suit must be brought in its name." *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998). A patentee retains standing if licensees hold some (but

less than all) substantial rights, including a "virtually unfettered right to sublicense."

*Aspex*, 434 F.3d at 1341-43.

Here, there is *no* contention that Uniloc transferred all substantial rights in the patent-in-suit to Fortress, rendering Fortress the new patent owner. Nor could there be. That would require an *exclusive* license, *see Luminara*, 814 F.3d at 1349-50, and Fortress's license was expressly "non-exclusive," Appx610(§ 2.1).[13] A licensee's ability to sublicense does not defeat the patent owner's standing unless the license agreement goes *further* and transfers "all substantial rights" to the licensee. That did not happen here. Uniloc "remain[ed] the owner of the patent and retain[ed] the right to sue for infringement." *Mann*, 604 F.3d at 1359.

---

[13] The district court recognized that Uniloc Lux held title to the '203 patent at the time of suit, Appx11, making Uniloc Lux the "patentee" under 35 U.S.C. §§ 100(d) and 154(a)(1). Nor would it matter if anyone urged that Uniloc Lux's license agreement with Uniloc USA effectively rendered *Uniloc USA* the patent owner, because Uniloc USA was a named plaintiff as well. As "the owner of the patent for standing purposes," Uniloc USA would possess "the right to sue," *Mann*, 604 F.3d at 1359-60, and in fact sued as a named plaintiff. Insofar as Uniloc Lux "remain[ed] the owner of the patent and retain[ed] the right to sue," *id.* at 1359, it was a named plaintiff too. Because both Uniloc Lux and Uniloc USA are plaintiffs, there is jurisdiction either way. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (presence of one plaintiff with standing satisfies Article III). And now that the patent has been assigned to Uniloc 2017, Uniloc 2017 should be substituted as the sole plaintiff going forward. *See* pp. 59-60, *infra*.

III. **Uniloc Had Standing Because Any Sublicensing Right Was Extinguished Before Suit Was Filed—And Could Not Release Past Infringement Regardless**

A. **Any Event of Default Was Annulled or Nonexistent Before Uniloc Filed Suit**

Even if Fortress once had a right to sublicense, it was extinguished before Uniloc filed suit. Under the RSA and License Agreement, Fortress could "only use the Patent License" (including sublicensing authority) upon "an Event of Default." Appx610(§ 2.1); Appx496(§ 2.8). An Event of Default, however, could be annulled if Uniloc "'cured such Event of Default to [Fortress's] reasonable satisfaction.'" Appx7 (quoting Appx502-503(§ 7.3(y))).

The district court concluded that an Event of Default occurred in March 2017 when Uniloc fell short of an RSA revenue target. Appx7. It is "uncontested," however, that "Fortress did *not* believe the Unilocs to be in default." Appx7 (emphasis added); *see* Appx543(¶5). Fortress was unequivocal: "Uniloc *had not defaulted* on the [RSA]" by missing a revenue target. Appx544(¶10) (emphasis added). Fortress was at all times "satisfied with Uniloc's [monetization] efforts." Appx544(¶8). Whether or not Uniloc cleared the March 2017 revenue target, that target was "no longer of significance to Fortress," because "the situation had changed markedly, and positively, since December 2014" when the target was set. Appx544(¶10). "[A]t no time . . . did Fortress consider Uniloc as being in default." Appx545(¶13).

42

Even if an Event of Default did occur—unbeknownst to any contracting party—it was cured to Fortress's reasonable satisfaction before Uniloc filed suit. By May 2017, "Fortress [was] completely aware of [Uniloc's] Actual Monetization Revenues numbers." Appx545(¶12). At that time—just weeks after the alleged default—"Fortress made a substantial *additional* investment" in Uniloc. Appx544(¶10) (emphasis added). So "to the extent there had been minimum monetization revenue requirements . . . , Fortress viewed [its May 2017 investment] as wiping the slate clean." Appx545(¶12). That investment, Fortress explained, "establishe[d] [that] Uniloc had cured th[e] ostensible 'Event of Default' to Fortress's satisfaction." Appx545(¶12).

Even though the parties to the RSA—Fortress and Uniloc—agreed that any Event of Default was cured (if one ever existed), the district court ruled there had been no cure. Appx7. To the court, "[c]ure connote[d] action," and thus required an affirmative act by Uniloc. Appx8-9. But the RSA does not demand that cures take particular form or involve "action." Appx8. *Anything* that "reasonabl[y] satisfi[es]" Fortress qualifies. Appx502-503(§7.3(y)). Here, Fortress attested that it "was reasonably satisfied Uniloc had effected a cure." Appx543, Appx545(¶¶4, 12). Specifically, "Fortress was satisfied with Uniloc's *efforts*" "to diligently *pursue* monetization." Appx544(¶8) (emphasis added). Those efforts persuaded Fortress to make the substantial investment in May 2017, reinforcing that Uniloc had cured

43

any default to Fortress's reasonable satisfaction.  Appx545(¶12).  Even if "cure" required "action," Uniloc's ongoing efforts to diligently pursue monetization checked that box.[14]

The district court invoked the agreement memorializing Fortress's May 2017 investment, which stated that it did not constitute "'a waiver of any provision of the [RSA].'" Appx10 (quoting Appx516(§4)).  As the district court observed, however, the RSA "used both 'cure' and 'waiver,' and so means different things by them." Appx8-9.  Language concerning *waiver* has nothing to do with whether any default had been *cured* to Fortress's reasonable satisfaction by Uniloc's diligent efforts, or whether Fortress's new investment evidenced Fortress's satisfaction.

It was error for the district court to disregard "the parties' course of dealing" and Fortress's stated position regarding default and cure.  Appx10.  As this Court has explained, "[t]he breach of a contract potentially involves disputes of materiality, potential opportunities to cure, and available remedies, all of which are *consummate contract issues to be resolved between the parties*." *ADP*, 772 F. App'x at 895 (emphasis added).  The contracting parties' views on whether an alleged breach was immaterial, cured, or insufficient to trigger a remedial provision (and whether they

---

[14] The district court erroneously stated that Uniloc "admit[ted] that [it] took no action to cure." Appx8 (emphasis omitted).  Uniloc explicitly argued that "the level of monetization Uniloc actually achieved," combined with its "performance as to other financial aspects of the relationship," formed the basis of its "cure." Appx579-580.

behaved consistent with that belief) is thus highly relevant—particularly where, as here, the contracting parties agree there was no breach and curing any breach required only Fortress's reasonable satisfaction.  That is why Apple, a stranger to the contract, cannot assert breach in the first place.  *See* pp. 24-27, *supra*.  At the very least, the district court could not dismiss those considerations entirely.  If the issue could be litigated by Apple—and it could not—such factual questions would be for a factfinder to resolve at trial.

### B.     Even If Fortress Had Sublicensing Authority Capable of Affecting Standing, Uniloc Could Sue for Past Infringement

At a minimum, Uniloc had standing to sue for infringement that *predated* any right Fortress had to sublicense the patent-in-suit.  Fortress's right to sublicense could be exercised only after an Event of Default, and only with respect to patents held by Uniloc.  Appx496(§ 2.8); Appx609, Appx610(§§ 1, 2.1).  The only Event of Default found by the district court allegedly occurred in March 2017.  Appx7.  But Uniloc acquired the '203 patent in May 2017.  Appx1.  Consequently, even assuming an unremedied breach, Fortress could not have sublicensed the patent until May 16, 2017, when Uniloc acquired it.  Appx1.

Fortress could not authorize third parties' use of the invention *before* that date. The RSA merely granted Fortress a (contingent) "right to grant sublicenses" to third parties.  Appx496(§ 2.8).  A "license to a third party," however, "only operates *prospectively*."  *Ethicon*, 135 F.3d at 1467 (emphasis added)*; see Davis v. Blige*, 505

F.3d 90, 103-04 (2d Cir. 2007) (collecting cases).  Even the "grant of a license by one co-owner cannot deprive the other co-owner of the right to sue for accrued damages for past infringement.  That would require a *release*, not a *license*." *Schering*, 104 F.3d at 345 (emphasis added).  The same result follows here: If a co-owner cannot forgive past infringement on a patentee's behalf, a mere licensee cannot either.  *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 197-98 (2d Cir. 2018).[15]  Uniloc thus at a minimum had a right to exclude—and retained standing to sue for infringement occurring—*before* May 2017.

The law often allows parties to sue for events before a particular date, but not after.  For example, the owner of an expired patent can sue for infringement predating expiration.  It may lack a *present* right to exclude, but can sue for *past* invasions of that right.  *See Keranos, LLC v. Silicon Storage Tech., Inc.*, 797 F.3d 1025, 1033 (Fed. Cir. 2015).  Likewise, Uniloc could at the very least sue for infringement occurring before Fortress had any right to sublicense the patent.

The district court urged that "Fortress's licensing rights operate both prospectively and retrospectively" because the RSA and License Agreement do not

---

[15] While *Spinelli* arose in the copyright context, the Second Circuit relied on this Court's precedent and parallels between patent and copyright law.  *See* 903 F.3d at 198 (citing *Davis*, 505 F.3d at 99-100, 103); *Davis*, 505 F.3d at 104 (citing *Schering*, 104 F.3d at 345).  *Spinelli* is thus particularly apposite, given the "historic kinship between patent law and copyright law." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 (1984).

expressly state that Fortress was granted "only a *prospective* right to grant sublicenses." Appx13. That is backward. "Patent licenses are prospective *unless* the parties make them retroactive with clear language." *Oyster Optics, LLC v. Infinera Corp.*, 843 F. App'x 298, 302 (Fed. Cir. 2021); *see Ethicon*, 135 F.3d at 1467; *Schering*, 104 F.3d at 345; *Spinelli*, 903 F.3d at 197-98; *Davis*, 505 F.3d at 103-04. No such language exists here. The RSA and License Agreement nowhere authorize Fortress to "retroactively license" or "release" past infringement.[16] The agreements mention a right to "exploit" the patents, Appx610(§ 2.1), but "freedom to exploit the patent" does *not* include the ability to "release [a defendant] from its liability for past accrued damages" to a patent owner. *Ethicon*, 135 F.3d at 1467-68.

The district court thought the absence of a provision declaring Fortress's license prospective-only was significant because such terms are purportedly "'readily found in other, similar contracts.'" Appx13. But the court offered no evidence for that supposition. Neither did Apple. Of the two cases Apple cited, Appx601-602, one involved an expressly "retroactive license" that expressly "extinguishe[d] any liability for past infringement," *Canon Inc. v. Tesseron Ltd.*, 146 F. Supp. 3d 568, 578 (S.D.N.Y. 2015). The other ignored this Court's instruction

---

[16] *Contrast Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1567 (Fed. Cir. 1993) (agreement specifying "'retroactive . . . license'"); *ADP*, No. 18-1132, ECF #82, at 36 (§ 2.1) (Uniloc-IBM agreement allowing IBM in certain circumstances "to grant . . . sublicenses *and releases*" (emphasis added)).

that retroactive licenses require clear language. *See Acceleration Bay LLC v. Activision Blizzard, Inc.*, No. 16-cv-453, 2017 WL 3668597, at *3 (D. Del. Aug. 24, 2017). Apple offered *no* example of an actual provision declaring a license to be prospective-only—doubtless because licenses are *presumed* purely prospective "[a]bsent agreement to the contrary." *Ethicon*, 135 F.3d at 1467.

## IV.   THE PATENT CLAIMS PATENT-ELIGIBLE SUBJECT MATTER UNDER § 101

The Patent Act makes any "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof," eligible for a patent. 35 U.S.C. § 101. Courts have recognized exceptions under which "laws of nature, natural phenomena, and abstract ideas" are ineligible under § 101. *Diamond v. Diehr*, 450 U.S. 175, 185 (1981). Here, the district court ruled that, if its standing decision is overturned, it would reinstate its earlier ruling that the '203 patent claims ineligible subject matter under § 101. Appx13-14. Under the two-step test used to determine patent eligibility, *see Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014), the district court's § 101 decision was incorrect.[17]

Under Step 1, the Court must "first determine whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice*, 573 U.S. at

---

[17] The district court's erroneous jurisdictional ruling does not preclude consideration of the merits. If the district court had jurisdiction—and it did—this Court does too. Because the § 101 issue was resolved on the pleadings and is reviewed *de novo*, judicial economy favors deciding it now.

218. If not, the § 101 inquiry ends—the claims are patent-eligible. *Id.* If the claims are directed to an ineligible concept, the analysis proceeds to Step 2 and examines "the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application" of the idea. *Id.* at 217 (quotation marks omitted). The '203 patent does not claim an unpatentable abstract idea at either step.

### A.    The Claims Are Patent-Eligible Under *Alice* Step 1 Because They Provide a Technological Solution to a Technological Problem

The '203 patent's claims are not "directed to" an abstract idea at *Alice* Step 1. Patent-ineligible "abstract ideas" include such things as "mathematical algorithm[s]," *Parker v. Flook*, 437 U.S. 584, 591-92 (1978), "method[s] of organizing human activity," *Alice*, 573 U.S. at 220, and "fundamental economic practice[s]," *Bilski v. Kappos*, 561 U.S. 593, 611 (2010). The '203 patent is not directed to any of those things. It is directed to a concrete, patent-eligible "technological solution to a technological problem." *Packet Intelligence LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1309 (Fed. Cir. 2020). The invention solves temperature-regulation issues specific to the operation of rechargeable batteries. It uses circuit components and temperature and current thresholds to dynamically adjust charging and discharging operations based on real-time conditions; it sets the current to zero when a predetermined upper threshold is exceeded; and it can set the current to maximum when a predetermined lower threshold is passed. *See* pp. 2-7, *supra*. Such an

49

invention for improving the physical operation of electrical devices has never been considered a mere abstract idea.[18]

1.    The Supreme Court's decision in *Diehr* is particularly "instructive" here. *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1348 n.2 (Fed. Cir. 2017). *Diehr* is practically on all fours.  The claim there was for a "method of operating a rubber-molding press for precision molded compounds with the aid of a digital computer."  450 U.S. at 179 n.5.  The claim involved use of a mathematical formula, the "Arrhenius equation," that had "long been used to calculate the cure time in rubber-molding processes."  *Id.* at 177 n.2.  The claim recited the following steps:

- providing a computer with a database containing values relevant to the press;

- starting a timer upon closure of the press to monitor the elapsed time;

- "'constantly determining the temperature'" of the mold and providing that temperature to the computer;

- using that temperature, the values in the database, and the Arrhenius equation to "'repetitively calculat[e] in the computer'" the "'total required cure time'";

- repeatedly comparing the "'calculation of the total required cure time'" against the "'elapsed time'"; and

---

[18] The district court invoked only § 101's "abstract idea" exception, not any other exception.  Appx21, Appx24-25.  As Apple conceded in the previous appeal in this case, "the District Court never concluded that the patent is directed to a law of nature, and Apple never argued that it is."  Corrected Opening Brief for Defendant-Appellee 13, No. 18-2094, ECF #32 (Fed. Cir.).

- "'opening the press automatically'"—ending the curing process—when the elapsed time reached the calculated total cure time. *Id.* at 179 n.5.

The Court held the patent did not claim an ineligible concept. *Id.* at 187. Rather, it sought "patent protection for a process of curing synthetic rubber" and "describe[d] in detail a step-by-step method for accomplishing" that process. *Id.* at 184, 187. The Court explained that "Arrhenius' equation is not patentable in isolation, but when a process for curing rubber is devised which incorporates in it a more efficient solution of the equation, that process is at the very least not barred at the threshold by § 101." *Id.* at 188. "Industrial processes such as this are the types which have historically been eligible to receive the protection of our patent laws." *Id.* at 184.

The '203 patent is no different. As in *Diehr*, the patent here solves a practical technical problem and claims a step-by-step approach for achieving that solution using a specified arrangement of physical components. Appx58, Appx62(8:1-15). In *Diehr*, the problem was curing rubber in a mold; here, it is regulating temperature in the operation of rechargeable batteries. Appx59-61(2:13-51, 3:58-4:12, 5:16-6:43). In *Diehr*, a sensor measured the temperature around the rubber press; here, a "temperature sensor" measures the temperature around the battery. Appx62(8:4-5); *see* Appx60(4:20-40). In *Diehr*, the computer processed temperature information using values from a database and the Arrhenius equation to determine the appropriate cure time; here, the "controller" processes temperature information using values

51

from a look-up table to determine the appropriate "charging current" or "discharging current." Appx61-62(5:62-6:22, 8:1-15). And in both cases that information is used to produce a physical response. In *Diehr*, the computer opened the rubber press—ending the curing process—when a defined threshold was reached. Here, the controller sets the charging or discharging current to zero—ending the charging or discharging process—when a defined threshold is reached. Appx62(8:8-15). Like the patent in *Diehr*, the '203 patent is directed to a concrete configuration of hardware that measures a relevant temperature, assesses that temperature by reference to preprogrammed values, and produces a physical response in the system that yields a technical improvement over the prior art.[19]

Purporting to distinguish *Diehr*, the district court urged that the '203 patent "claims sweeping, abstract swaths of possible methods and apparatuses using admittedly industry-standard hardware to implement the patent-ineligible concept that battery designers can adjust a battery's current flow to control its temperature." Appx22. That rhetoric—unsupported by analysis or record citation—does not withstand scrutiny. One could just as easily accuse the inventor in *Diehr* of claiming "sweeping, abstract swaths of possible methods and apparatuses using admittedly

---

[19] Claims 5 and 13 of the '203 patent go further, setting the "current to a *maximum* value when [the] temperature is *lower* than a second predetermined threshold." Appx62 (emphasis added). *Diehr* had no comparable second threshold for triggering a second physical response.

industry-standard hardware to implement the patent-ineligible concept that" rubber makers can calculate cure time using the well-known Arrhenius equation, elapsed time, and temperature.

There is nothing "sweeping" or "abstract" about, for example, the claims' specific direction to set the "current to zero" when the "temperature is higher" than a "predetermined threshold value," Appx62-63(7:43-45, 8:14-15, 8:46-48, 9:15-17) (claims 1, 8, 16, 23), or the direction to set the "current to a maximum value" when the "temperature is lower" than another "predetermined threshold value," Appx62(7:58-60, 8:32-34) (claims 5, 13). Nor is this a case where the claims are "missing . . . physical structure or steps for achieving [a] claimed result," *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1295 (Fed. Cir. 2020); the claims here recite both specific steps and physical hardware for achieving the invention's aim. That the invention can be implemented using "industry-standard hardware," Appx22, does not matter either. The claims in *Diehr* utilized industry-standard equipment, including a generic "computer with a data base" and a pre-existing rubber "press." 450 U.S. at 179 n.5. The district court's decision rests on the erroneous view that any patent claim that *employs* scientific principles is necessarily *directed to* those principles. Claims are not "directed to" an abstract idea merely because they "involve" one. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016).

2.    This Court's cases confirm that the claims here are not "directed to" patent-ineligible subject matter.  In *Thales*, the Court rejected a § 101 challenge because the claims were "nearly indistinguishable from the claims at issue in *Diehr*." 850 F.3d at 1348.  *Thales* involved "an inertial tracking system for tracking the motion of an object relative to a moving reference frame." *Id.* at 1344.  The claim required "inertial sensor[s]" mounted on a tracked object (*e.g.*, a pilot's helmet) and on a moving platform (*e.g.*, the plane), as well as "an element that uses the data from the two inertial sensors to calculate the orientation of the tracked object relative to the moving platform" using mathematical equations. *Id.* at 1348.  Despite the claims' use of standardized "inertial sensors and application of laws of physics," this Court held they were "not directed to an abstract idea," but sought "to protect only the application of physics to the unconventional configuration of sensors as disclosed." *Id.* at 1348-49.  The same is true of the '203 patent's claims: Even if the recited arrangement of physical components *utilizes* the correlation between current and temperature, that does not mean the claims are *directed to* that concept. Appx62(8:1-15).  If the claims in *Thales* satisfied § 101 because they were "nearly indistinguishable from the claims at issue in *Diehr*," 850 F.3d at 1348, the claims here—which mirror the *Diehr* claims even more closely—satisfy § 101 *a fortiori*.

This Court and the Supreme Court routinely find inventions eligible where, like the '203 patent, they present a "technological solution to a technological

problem." *Packet*, 965 F.3d at 1309.  For example, this Court has explained that the claims in *Diehr* were eligible in part because they "reduced the likelihood that the rubber molding process would result in 'overcuring' or 'undercuring,'" while in *Thales*, the claims "reduce[d] errors in an inertial system that tracks an object on a moving platform." *Thales*, 850 F.3d at 1348.

Here, the '203 patent reduces the risk that charging or discharging recharge-able batteries will result in dangerous overheating or frustrating underperformance. *See* Appx59-60(1:51-2:12, 2:52-57, 3:58-4:12); pp. 2-7, *supra*.  It does so through concrete technological means: using current thresholds and circuit components to dynamically adjust charging and discharging operations based on real-time temperature conditions, setting the current to zero when a predetermined threshold is exceeded, and even maximizing current when a lower threshold is crossed. Appx62(8:1-15, 8:32-34).  Such claims are not "directed to" an abstract idea.  *See, e.g.*, *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1364-65 (Fed. Cir. 2020); *Uniloc USA, Inc. v. LG Electronics USA, Inc.*, 957 F.3d 1303, 1309 (Fed. Cir. 2020).

## B.    The Claims Recite a Patent-Eligible Application for Purposes of *Alice* Step 2

Because the '203 patent's claims are not directed to an abstract idea at *Alice* Step 1, this Court need go no further.  *See Enfish*, 822 F.3d at 1339.  But even if one were to assume the claims are directed to the abstract idea of "adjusting a battery's current flow based on temperature," Appx19, they recite "a patent-eligible applica-

tion" of that idea at *Alice* Step 2, 573 U.S. at 217. They present an "'inventive concept'" through a specific "combination of elements" that achieves advances over the prior art. *Id.*

At *Alice* Step 2, a court examines "the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application" of any purported abstract idea. 573 U.S. at 217 (quotation marks omitted). Here, the '203 patent does not merely note or claim the theoretical correlation between "a battery's current flow" and "temperature." Appx19. It claims a particular combination of circuit components—a "temperature sensor," a "charging circuit" and "discharging circuit," and a "controller" that is "operable" to dynamically adjust current flow in response to temperature (which can reflect not only heat produced by the "battery's current flow," Appx19, but also heat from other components and ambient conditions, Appx60(4:20-40)). The patent claims setting the "current to zero" when the temperature exceeds a "predetermined threshold." Appx62 (claim 8); *see* Appx62-63 (claims 1, 15-16, 23). And claims 5 and 13 go further, setting the current to a "maximum value" when the temperature goes *below* a "second predetermined threshold." Appx62; *see* pp. 52-53 & n.19, *supra*.

That "ordered combination" of claim elements solves a technical problem in the field of rechargeable-battery technology. *Alice*, 573 U.S. at 225. And far from

merely claiming the *concept* that one can "adjust a battery's current flow to control its temperature," Appx22, the '203 patent claims an *application* of that concept to battery-charging technology through the specific configuration of circuits, controllers, and sensors recited in the claims. The claims require the use of specific, physical electronic components to perform physical acts, such as "set[ting]" a battery's "charging" or "discharging current" in particular ways. Appx62(8:1-15). That is not a mere abstract thought or calculation that can be "performed mentally or with pencil and paper." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1148 (Fed. Cir. 2016). It is a practical, patent-eligible application in a concrete electrical device.

## C.    The District Court's Decision Contravenes § 101 Law and Ignores Claim Elements

The district court reached the wrong result by focusing on only one aspect of the invention and ignoring its concrete elements. At *Alice* Step 1, a court must analyze the "claims, considered in light of the specification," and decide whether "'their character as a whole is directed to excluded subject matter.'" *Enfish*, 822 F.3d at 1335. But one searches the district court's opinion in vain for actual analysis of the claims themselves, their specific limitations, or how they together compose the claimed apparatuses and methods. Nor is there any genuine discussion of the specification's explanation of how the claimed elements work together to improve upon prior-art rechargeable batteries.

To the extent the opinion consults the patent, it fixates on the "very first sentence of the '203 patent"—the Abstract—which "describes the claimed invention as '[a] method and apparatus for controlling the charge and discharge *currents in a battery as a function of temperature.*'" Appx21 (quoting Appx56) (alterations in original). But *any* patent would be deemed "abstract" if courts considered only the patent's Abstract. "[D]escribing the [patent] at such a high level of abstraction and untethered from the language of the claims all but ensures" it will be found ineligible under § 101. *Enfish*, 822 F.3d at 1337.

The district court stated that "the '203 patent teaches no inventive 'particular configuration of sensors and method of using the raw data' comparable to that in *Thales*." Appx23. That conclusory assertion—unsupported by analysis of the claims, citation to the patent, or record evidence—is mistaken. The patent teaches an inventive technological solution—including adjusting conditioning operations in specific ways—to address a technological problem that plagued the prior art.

The district court's assertion that the '203 patent is unduly "'preempt[ive]'" because its "gravamen" is to "appl[y] the basic concept that reducing a battery's electrical current flow also reduces its temperature," Appx24 (emphasis omitted), encapsulates the flaws in its analysis. The invention's preemptive scope is not defined by what one perceives as the claims' "gravamen" or the "basic concept" they may employ; it is defined by the "battery design" the claims recite. Appx24; *see*

*Diehr*, 450 U.S. at 187.  The claims do not preempt other ways of controlling battery temperature, or even other ways of controlling battery temperature by controlling current.  Myriad other solutions—from adding cooling equipment to using "pulses" of current—fall outside the claimed invention.  *See* pp. 3-4, *supra*.  The court's failure to consider what the claims actually cover, as opposed to a high-level caricature, fatally undermines its § 101 analysis.

## V.    UNILOC 2017 SHOULD BE SUBSTITUTED OR JOINED AS PLAINTIFF

While this action was pending, Uniloc Lux assigned the '203 patent and others to Uniloc 2017 LLC.  Appx227; Appx2002-2004.  That assignment made Uniloc 2017 the patent's new owner and the "patentee" entitled to sue for infringement.  *See* 35 U.S.C. §§ 100(d), 154(a)(1), 261, 281; pp. 20-23, *supra*.  Where "an interest is transferred" during litigation, "the action may be continued by . . . the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party."  Fed. R. Civ. P. 25(c); *cf.* Fed. R. App. P. 43(a)-(b).  Uniloc accordingly moved to join Uniloc 2017—the transferee and current owner of the '203 patent—as plaintiff in this action.  Appx234.

Several courts have recognized that Uniloc 2017 is a proper plaintiff to continue actions involving patents it acquired from Uniloc Lux.  *See Uniloc 2017 LLC v. Blackboard Inc.*, No. 20-cv-665, Dkt. 68 (D. Del. Jan. 10, 2020) (substituting Uniloc 2017 as plaintiff following assignment) (entered pre-transfer by W.D. Tex.),

*subsequent judgment appealed*, No. 21-1795 (Fed. Cir.); *see also Uniloc USA, Inc. v. Samsung Electronics Am., Inc.*, 809 F. App'x 863, 864 n.1 (Fed. Cir. 2020) (Uniloc 2017 joined post-assignment); *Uniloc USA Inc. v. LG Electronics U.S.A. Inc.*, Nos. 18-cv-6737 *et al.*, 2019 WL 690290, at *1-2 (N.D. Cal. Feb. 19, 2019) (joining Uniloc 2017). The district court here did not contend otherwise. But it denied Uniloc's Rule 25(c) motion as moot in light of its dismissal on standing grounds. Appx13.

The court's ruling that Uniloc lacked standing when it filed suit was erroneous for the reasons discussed above. Upon reversal, that sole basis for not adding Uniloc 2017 under Rule 25(c) will have vanished. This Court has independent authority to order substitution based on a transfer of interest. *See* Fed. R. App. P. 43(b). It should do so here.

## CONCLUSION

The judgment dismissing for lack of jurisdiction should be reversed. The Court should hold that the patent claims eligible subject matter under § 101. Uniloc 2017, the current owner of the patent-in-suit, should be substituted as plaintiff.

May 25, 2021                                  Respectfully submitted,


                                             /s/ Jeffrey A. Lamken

James J. Foster                              Jeffrey A. Lamken
Aaron S. Jacobs                                 *Counsel of Record*
PRINCE LOBEL TYE LLP                         Lucas M. Walker
One International Place                       Kenneth E. Notter III
   Suite 3700                                 MOLOLAMKEN LLP
Boston, MA  02110                            The Watergate, Suite 500
(617) 456-8000 (telephone)                   600 New Hampshire Avenue, N.W.
(617) 456-8100 (fax)                         Washington, D.C.  20037
                                             (202) 556-2000 (telephone)
Jordan A. Rice                               (202) 556-2001 (fax)
MOLOLAMKEN LLP                               jlamken@mololamken.com
300 N. LaSalle Street, Suite 5350
Chicago, IL  60654
(312) 450-6700 (telephone)
(312) 450-6701 (fax)


*Counsel for Appellants Uniloc USA, Inc. and Uniloc Luxembourg S.A.*

**ADDENDUM**

# ADDENDUM – TABLE OF CONTENTS

Page

Order Dismissing Case for Lack of Standing
    (Dec. 4, 2020) (Dkt. 186).........................................................................Appx0001

Order Granting Motion for Judgment on the Pleadings
    (May 18, 2018) (Dkt. 99)..........................................................................Appx0015

Judgment (May 18, 2018) (Dkt. 100) ...........................................................Appx0028

U.S. Patent No. 6,661,203 (Dec. 9, 2003) ...................................................Appx0056

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNILOC USA, INC., et al.,

        Plaintiffs,

    v.

APPLE, INC.,

        Defendant.

No.  C 18-00358 WHA

**ORDER DISMISSING CASE FOR LACK OF STANDING**

United States District Court
Northern District of California

## INTRODUCTION

Having earlier found the asserted patent claims invalid for reciting ineligible subject matter, the Federal Circuit has further directed us to consider plaintiffs' standing.  This order holds that plaintiffs' patent licensing scheme divested them of exclusionary rights and, thus, of Article III standing.  The defect uncurable, even via joinder, this case is **DISMISSED**.

## STATEMENT

Hewlett Packard assigned several patents to Uniloc Luxembourg on May 16, 2017. Uniloc Luxembourg promptly licensed the patents to Uniloc USA, and the two filed a slew of suits against Apple on May 26 in the Eastern District of Texas.  Following transfer and assignment to the undersigned, an order dated May 18, 2018, granted judgment on the pleadings to Apple in the instant case, finding the asserted claims of United States Patent No. 6,661,203 invalid under 35 U.S.C. § 101 (Dkt. No. 99).  The Unilocs appealed.

While on appeal, the related cases (Nos. C 18-00360 *et seq.*) proceeded. Therein, Apple discovered information that might undermine the Unilocs' standing to sue. Since 2014, the Unilocs' funding for their patent suits came from Fortress Credit Co LLC, by way of a loan pursuant to a Conformed Revenue Sharing and Note and Warrant Purchase Agreement ("Revenue Sharing Agreement"), a Patent License Agreement, and several later amendments.

Fortress's security interest in the loan took the form of, at least in part, a broad license of the Unilocs' patents upon one specific condition. The Revenue Sharing Agreement granted Fortress a "a non-exclusive, royalty free, license (including the right to grant sublicenses) with respect to the Patents" but on the condition that Fortress "shall only use such license following an Event of Default" (Rev. Sh. Agmt., Dkt. No. 165-5 § 2.8). The Patent License Agreement echoed:

> Subject to the terms and conditions herein and in the Purchase Agreement, Licensor hereby grants to Licensee a non-exclusive, *transferrable, sub-licensable, divisible, irrevocable*, fully paid-up, royalty-free, and worldwide license to the Licensed Patents, including, but not limited to, the rights *to make*, have made, market, use, sell, offer for sale, import, export and distribute the inventions disclosed in the Licensed Patents *and otherwise exploit* the Licensed Patents *in any lawful manner in Licensee's sole and absolute discretion* solely for the benefit of the Secured Parties ("Patent License"), provided that *Licensee shall only use the Patent License following an Event of Default*.

(Pat. Lic., Dkt. No. 165-6 § 2.1) (emphasis added).

Section 7.1.2 of the Revenue Sharing Agreement defined an "Event of Default" as, in relevant part, the "fail[ure] to perform or observe any of the covenants or agreements contained in Article VI," which in turn provided:

> 6.2.2. From the Closing Date through December 31, 2016, the Company [Uniloc] shall have received at least $20,000,000 in Actual Monetization Revenues. As of March 31, 2017 and the last day of each fiscal quarter thereafter, the *Company shall have received at least $20,000,000 in Actual Monetization Revenues during the four fiscal quarter period ending on such date*.

(Rev. Sh. Agmt. § 6.2.2) (emphasis added).

Apple moved to dismiss the related cases, arguing that the Unilocs had, in fact, defaulted on their monetization requirements and had, thus, released the sole limit on Fortress's broad

2

sublicensable rights in the asserted patents, divesting the Unilocs of standing to sue. An order dated January 17, 2019, found the two Unilocs did possess sufficient rights in the asserted patents to confer standing. Despite the apparent default of the revenue sharing terms, the order found that the Unilocs had cured their default to Fortress's reasonable satisfaction, as somewhat evidenced by their later May 15 amendment. On reconsideration, a subsequent order declined to disturb this finding, but noted that Apple might be permitted to challenge the Unilocs' standing at trial and authorized discovery on the matter in the interim. It appears, however, that discovery was either limited or never took place, as the cases were stayed pending *inter partes* review (Case No. C 18-00360, Dkt. Nos. 131, 157, 204).

All of that happened in the related cases. This case had gone on appeal to the Federal Circuit when Uniloc challenged the holding that its asserted claims were invalid. On appeal, Apple alerted the Federal Circuit to the standing issue progressing in the related cases, so the panel remanded for discovery and resolution of the question of standing "in the first instance." *Uniloc USA v. Apple Inc.*, 784 Fed. App'x 763, 768 (Fed. Cir. 2019). So we come back to square one.

On remand, the Unilocs moved for a declaration of jurisdiction and joinder of a new entity, Uniloc 2017. An order dated December 16, 2019, held the motion in abeyance and, following the panel's direction, ordered disclosure of all discovery taken in the related cases. When that proved insufficient, a January 29 order granted written discovery into the question of the Uniloc-Fortress dealings. Disputes remaining, an April 1 order referred the discovery to Magistrate Judge Donna M. Ryu. Following completion of that discovery, the Unilocs again move for a declaration of jurisdiction and for joinder of Uniloc 2017. Apple opposes and moves to dismiss the Unilocs for lack of standing. This order follows full briefing and a hearing (held telephonically due to COVID-19).

**ANALYSIS**

**1. PATENT STANDINGS STILL REQUIRES "EXCLUSIONARY RIGHTS."**

Federal jurisdiction rests on "the irreducible constitutional minimum of standing." The invoking party must show a concrete, particularized, and actual or imminent (as opposed to

conjectural or hypothetical) injury in fact, fairly traceable to the defendant's conduct, which will be redressed by a favorable decision. Standing must exist at the outset and must persist through a case. Though mere allegations of standing may suffice on the pleadings, in successive stages of litigation, evidence will be required. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). A defect may be raised at any time, and neither waiver, estoppel, nor the parties' consent may overcome it. *See Booth v. United States*, 990 F.2d 617, 620 (Fed. Cir. 1993); *Diggs v. Dep't Hous. & Urb. Dev.*, 670 F.3d 1353, 1355 (Fed. Cir. 2011); *Cf. United States v. Johnson*, 319 U.S. 302, 305 (1943).

In a competing vein, Congress permits a "patentee" to sue for patent infringement. 35 U.S.C. § 281. "The term patentee includes the original patentee (whether the inventor or original assignee) and 'successors in title.'" *Lone Star Silicon Innov'ns LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1229 (Fed. Cir. 2019). But "[a] patent is, in effect, a bundle of rights which may be divided and assigned, or retained in whole or part." *Alfred E. Mann Found. for Scien. Rsch. v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010) (quotation marks omitted). So the identity of the "patentee" really asks who retains "all substantial rights under the patent." *See Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1342 (Fed. Cir. 2014), *vacated on other grounds*, 575 U.S. 959 (2015). This question turns on substance, not terminology. *See Lone Star*, 925 F.3d at 1229.

The Federal Circuit has articulated three categories of potential plaintiffs in patent cases. In the first category fall those who "hold all legal rights to the patent as the patentee or assignee of all patent rights — the entire bundle of sticks." If this patentee "transfers 'all substantial rights' to the patent" to another, the other becomes the patentee. Under the Patent Act, at least, the owner of "all substantial rights" may sue in her own name. *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339–40 (Fed. Cir. 2007).

In the second category come those who "hold exclusionary rights and interests created by the patent statutes, but not all substantial rights to the patent." Such a plaintiff holds rights that might be infringed under the Patent Act, and may sue for infringement — *but only alongside the patentee*, *i.e.*, the entity retaining "all substantial rights." *Morrow*, 499 F.3d at 1340. A

4

patent owner's absence, however, may be remedied via Rule 19 joinder. *See, e.g.*, *Lone Star*, 925 F.3d at 1236.

The third category of plaintiff includes those who "hold less than all substantial rights to the patent and lack exclusionary rights under the patent statutes." *Such a plaintiff may not sue for infringement*. *Morrow*, 499 F.3d at 1340–41. This defect cannot be cured, even by joinder. *See Azure*, 771 F.3d at 1347.

Now, confusion about the interplay between this (and, more broadly, any) framework of statutory right to sue and our doctrine of standing has long persisted. On the one hand, the United States Supreme Court has told us that standing "often turns on the nature and source of the claim asserted" and that, "[e]ssentially, the standing question in such cases is whether the constitutional *or statutory provision* on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (emphasis added). Following this guidance, the Federal Circuit has, at times, articulated this three-part framework under Section 281 using the language of Article III standing. *See, e.g.*, *Morrow*, 499 F.3d at 1339–41; *Azure*, 771 F.3d at 1344. On the other hand, in *Lujan* the Supreme Court told us that a statutory grant of a claim for relief did not satisfy or displace the standing inquiry. *Lujan*, 504 U.S. at 572–74.

More recently, however, the Supreme Court has clarified that whether a plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue" (*i.e.* who "has a cause of action under the statute") asks a question of statutory interpretation *separate* from the question of Article III standing, as "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the court's statutory or constitutional *power* to adjudicate the case." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128, fn. 4 (2014). So, a plaintiff's statutory right to invoke Section 281 and its constitutional standing to sue pose separate inquiries. And, thus, whether a plaintiff "possesses all substantial rights in a patent does not implicate standing or subject-matter jurisdiction." *Lone Star*, 925 F.3d at 1235–36.

The Unilocs argue that the Federal Circuit's three categories of patent plaintiff now play no part in the standing inquiry. In essence, they argue that we should start from scratch with the bare injury-in-fact inquiry and dispense with the Federal Circuit's previous construction of the requirement in the patent context, *i.e.* the requirement that a patent plaintiff possess exclusionary rights. This order disagrees. *Lexmark* and *Lone Star* do not require that we throw the baby out with the bathwater. They just require us to separate the inquiries of statutory right to sue and constitutional standing.

*Lone Star* held that "whether a party possesses *all substantial rights* in a patent does not implicate standing or subject-matter jurisdiction." It did not hold that whether a party possesses *any rights* in a patent does not implicate standing. Indeed, the wrong that *Lone Star* sought to correct was, in the Federal Circuit's view, that the district court had dismissed a plaintiff who lacked "all substantial rights" and had sued without the all-substantial-rights holder (*i.e.* "patentee") joined. The panel clarified that the plaintiff's allegation of exclusionary rights satisfied the constitutional inquiry (at least on the pleadings), whereas the plaintiff's lack of "all substantial rights" went instead (and separately) to its *statutory* right to sue (and then to Rule 19 joinder of the patentee). The circumstances did not present the panel with the opportunity to hold that a plaintiff possessing *less than* exclusionary patent rights would nonetheless have constitutional standing to sue. *Lone Star*, 925 F.3d at 1234–38.

Nor could *Lone Star* have so held. Despite the intermingling of statutory and constitutional language in prior decisions, the injury-in-fact inquiry drives our distinction between those with exclusionary rights and those without. "[T]he grant of an exclusive license to make, use, or sell [a] patented invention carries with it the right to prevent others from practicing the invention." *Morrow*, 499 F.3d at 1340. Patent infringement does "injury to [the party's] *exclusive right*." *Indep. Wireless Tel. Co. v. Radio Corp. Am.*, 269 U.S. 459, 469 (1926). That is, the *injury* — the concrete and particularized invasion of a legally recognized interest — requires a right to exclude others from practice of a claimed art. *Lujan*, 504 U.S. at 560. Without that right, there is no invasion, and a party "is not injured by that alleged infringer." *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1266 (Fed. Cir. 2010).

6

## 2.   DEFAULT GAVE FORTRESS BROAD PATENT RIGHTS.

Our facts are uncontested.  On March 31, 2017, the Unilocs had only gathered $14 million in revenue over the previous year.  Fortress did not believe the Unilocs to be in default.  And, discovery now reveals, *the Unilocs took no action to remedy any default and no one even discussed what steps the parties might take to cure a default*.  The parties contest, however, what this all means under the agreements.  It means, this order holds, that the Unilocs *did* default, *never* cured, and when they sued here, Fortress enjoyed a wide right to license the '203 patent *which divested the Unilocs of standing to sue*.

The Unilocs argue deference to the previous findings in the related cases.  But this would flout the Federal Circuit's direction to take discovery and resolve the matter "in the first instance."  Following this direction, and with a fresh and better record, this order considers the standing question anew.  784 Fed. App'x at 768.

Here are the details.  The Unilocs defaulted.  Under New York law, which governs the agreements here, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  *MHR Capital Partners LP v Presstek*, 12 N.Y.3d 640, 645, 912 N.E.2d 43 (2009).  The Unilocs missed their monetization mark by six million dollars, breached that term under Article VI of the Revenue Sharing Agreement, and triggered an Event of Default under Article VII.

The Unilocs failed to cure that Event of Default.  We again turn to the plain language of the agreement.  "Once an Event of Default has occurred, such Event of Default shall be deemed to exist and be continuing for all purposes of this Agreement."  The agreement provided three mechanisms to annul such a default:

> (1) Majority Purchasers shall have waived such Event of Default in writing;

> (2) [T]he Company shall have cured such Event of Default to the Majority Purchasers' reasonable satisfaction or the Company or such Event of Default otherwise ceases to exist; or

> (3) [T]he Collateral Agent and the Purchasers or Majority Purchasers (as required by Section 9.4.1) have entered into an amendment to this Agreement which by its express terms cures such Event of Default, at which time such Event of Default shall no longer be deemed to exist or to have continued.

7

(Rev. Sh. Agmt. § 7.3).

The first form of annulment falls away as the Unilocs offer no writing from Fortress waiving the default. And, the latter half of the second form offers no relief here. The Unilocs bear the burden of establishing standing, and they do not contend that they gathered six million more dollars by May 26, such that the default might cease to exist.

Nor does the third form offer aid. The Unilocs and Fortress did, in fact, amend their agreements on May 15, 2017, eleven days before filing this suit. But remedy via amendment requires the new agreement to "by its express terms cure[] such Event of Default." Our May 15 amendment says nothing of the sort. On the contrary, it states that "[t]he execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Collateral Agent or any Purchaser under the Agreement or any Document, nor constitute a waiver of any provision of the Agreement or any Document" (Dkt. No. 165-7). So, unless we disregard the express terms of *both the original agreement and the amendment*, which we cannot do under New York law, the May 15 amendment effected no cure of the Unilocs' default.

So the Unilocs must rely on the second form, their "cure[] [of] such Event of Default to the Majority Purchasers' [Fortress's] reasonable satisfaction." *But recall, the Unilocs now admit that they took no action to cure and, in fact, never discussed cure with Fortress at all.* Nevertheless, they contend that Fortress was reasonably satisfied, as evidenced by both Fortress's representatives' testimony that they did not believe an Event of Default to exist and by Fortress and the Unilocs' May 15 amendment.

Which begs the question: reasonably satisfied with what? The agreement requires a (i) "cure[]" to (ii) Fortress's "reasonable satisfaction." The Unilocs admit they didn't do anything. Again, "under New York law, 'words and phrases . . . should be given their plain meaning,' and the contract 'should be construed so as to give full meaning and effect to all of its provisions.'" *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005). Cure connotes action. *See, e.g.*, *In re Taddeo*, 685 F.2d 24, 26–27 (2d Cir. 1982). The Revenue Sharing Agreement used both "cure" and "waiver," and so means

8

different things by them, as evidenced by use the phrase "cure, *or* waiver" (Rev. Sh. Agmt. At

¶ 7.1.4). If, after default, Fortress can be reasonably satisfied with the Unilocs' total *inaction*

to remedy the default, that is a *waiver*. But such waiver of default must have been in writing.

Permitting the "reasonable satisfaction" clause to annul a default without a writing and where

no steps have been taken to cure it renders the waiver clause meaningless, a result we must

avoid. *See Corhill Corp. v. S.D. Plants, Inc.*, 9 N.Y.2d 595, 599, 176 N.E.2d 37, 38 (1961);

*see also Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1231 (Fed. Cir. 1997).

Regardless, Fortress cannot simply say that it did not believe an Event of Default to exist.

Given the uncontested fact that the Unilocs breached their monetization requirement, that

assertion contradicts and would rewrite the contract, something we do not permit later

testimony to do, particularly in the presence of a merger clause excluding parol evidence (Rev.

Sh. Agmt. § 9.9). *See Jarecki v. Shung Moo Louie*, 95 N.Y.2d 665, 669, 754 N.E.2d 1006

(2001). There was a way to remove the monetization requirement from the parties'

arrangement — amendment; something the parties did not do when they amended their

arrangement *while the Event of Default existed*.

When the Unilocs sued on May 26, 2017, the uncured Event of Default satisfied the only

precondition to Fortress's *use* of its "transferrable, sub-licensable, divisible, irrevocable"

license to make, use, sell, or "otherwise exploit" the '203 patent "in any lawful manner" in

Fortress's "sole and absolute discretion."

                    *          *          *

This order recognizes that it reaches the opposite result as the prior order in the related

cases (No. C 18-00360, Dkt. No. 157). There, the undersigned found, regardless of the

Unilocs' failure to meet their monetization goal, that a declaration by a Fortress executive and

the parties' third amendment to the Revenue Sharing Agreement evidenced Fortress's

reasonable satisfaction with the Unilocs' performance. Aside from our new record, and the

Federal Circuit's direction to take another look, the prior order lacked some crucial facts which

contributed to a correctable error of law.

9

*First*, the Court lacked the entirety of the third amendment to the Revenue Sharing Agreement. Relying on Fortress's declaration that "there is no dispute Fortress's signature to the May 15 Agreement establishes Uniloc had cured that ostensible 'Event of Default,'" the prior order found: "[t]hat Fortress chose to execute a third amendment . . . indicates that plaintiffs cured the purported default . . . to Fortress's reasonable satisfaction" (No. 18-00360, Dkt. Nos. 141-7 at ¶ 12; 157). Contradicting this finding, Section 4 of the amendment — which the parties *did not* then submit to the Court — stated "[t]he execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Collateral Agent or any Purchaser under the Agreement or any Document, nor constitute a waiver of any provision of the Agreement or any Document" (*compare* Dkt. No. 165-7 *with* No. 18-00360, Dkt. No. 134-9).

*Second*, the prior order broadly construed "cure" to encompass the parties' course of dealing following the Event of Default. This construction was understandable, given Unilocs' and Fortress's conduct following and in response to the default remained shrouded. Now, as noted above, discovery has since revealed that the Unilocs took *no* steps to remedy their default and never even discussed the matter with Fortress. As a result, the prior order (though it did not know it) construed "cure" so broadly as to encompass "waiver," a separate provision in the agreement.

Both factual errors contributed to the broader error of law. Construing the term "cure" to include a waiver of the default rendered redundant the separate requirement that waivers be in writing. And taking the third amendment as evidence of Fortress's reasonable satisfaction rendered redundant the separate requirement that amendments must expressly annul a default. As explained above, this ran afoul of New York's canon of contractual interpretation to avoid constructions that render a contract term meaningless. *Corhill*, 9 N.Y.2d at 599. A federal court should defer to a state's interpretation of state law. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). With the benefit of hindsight, the prior order gave short shrift to New York's interpretation of its

10

own law on this and several other of the points discussed above.  Having now recognized the error, this order now corrects course.

### 3.    THE UNILOCS LACKED "EXCLUSIONARY RIGHTS."

Fortress's broad rights in the '203 patent divested the Unilocs of standing to sue here.  As above, a party "derives its standing from the exclusionary rights it holds," and "its standing will ordinarily be coterminous with those rights."  For example, "an exclusive licensee lacks standing to sue a party who has the ability to obtain such a license from another party with the right to grant it."  *WiAV*, 631 F.3d at 1266.  "That same logic applies even if it is the patent owner holding the nonexclusive right and the licensee hold[ing] the exclusionary rights." *Azure*, 771 F.3d at 1344.  This bears restating, given the Unilocs' continual self-characterization as the "patent owner," as though Article III standing appears at the utterance of a magic phrase.  A patent licensee's right to grant an unencumbered sublicense renders even the *patent owner's* right to exclude (and, thus, to sue) illusory.  *Mann*, 604 F.3d at 1362.

Here then, though Uniloc Luxembourg held title to the '203 patent, it had granted *both* Uniloc USA and Fortress licenses which permitted each to sublicense the patent (No. C 18-00360, Dkt. No. 134-16).  Aside from agreeing to seek the Unilocs' consent before granting sublicenses that would impose financial burdens on them, Fortress held an unfettered right in its "sole and absolute discretion" to license the '203 patent to the world.  Neither Uniloc Luxembourg nor Uniloc USA could have had an expectation that others would not practice the '203 patent and would not have been injured if and when others did so.  The Unilocs offer three counterarguments.  None compel.

*First*, the Unilocs' protest that under *Alfred E. Mann Foundation for Science v. Cochlear Corporation* there *must always* be a patent owner, here the Unilocs, who has the right to sue and that any other result would be absurd.  Not so.

To start, *Mann* held only that there *can* only be one patent owner, holding "all substantial rights."  It did not hold that there *must always* be one.  Nor was that possibility raised.  *Mann* addressed a two-party agreement (as opposed to our tripart web) and asked only whether the patent owner still held enough (read "all substantial") rights to sue alone.  And, under *Lone*

11

*Star*, this question of who possesses "all substantial rights" goes to a party's statutory right to sue in its own name, as opposed to our present inquiry of Article III standing and "exclusionary rights." 604 F.3d at 1359–60; *Lone Star*, 925 F.3d at 1235–36; *see also*, *Aspex Eyewear v. Miracle Optics*, 434 F.3d 1336 (Fed. Cir. 2006).

It is perhaps true that where a patent owner has granted multiple others the right to sublicense the patent that no one would have the right to sue a particular defendant for infringement. But such a result is not absurd. This is still America; the free market is our default, and the patent is an aberration. Among our ordinary property rights comes the right to destroy, a right consistent with and applicable to the fleeting property interest of a patent which might be destroyed by failure to pay maintenance fees, voluntary commitment to the public domain, or other means. 35 U.S.C. § 41(b). Regardless, a licensing scheme that divests all interest holders of standing does not destroy a patent. It merely prevents suit until a restructuring of the interests among them. "While parties are free to assign some or all patent rights as they see fit based on their interests and objectives, this does not mean that the chosen method of division will satisfy standing requirements." *Morrow*, 499 F.3d at 1341, fn. 8.

*Second*, the Unilocs argue that Federal Circuit precedent prevents Apple from invoking contracts it was not a party to. In *Uniloc USA v. ADP, LLC*, several defendants moved to dismiss the appeal, arguing that Uniloc had breached an agreement with a third party, giving that third party broad licensing rights, and undermining Uniloc's standing. The Federal Circuit, in a nonprecedential decision, denied the motion, explaining that no one had shown that the third party, "which is not a party to this litigation, considers Uniloc to be in breach or has asserted a right to sublicense and release Movants from liability relating to the patents-at-issue." 772 Fed. App'x 890, 894–95 (Fed. Cir. 2019).

Yet *ADP* distinguishes itself from this case. There, the panel described the third-party interest in the patents as "reversionary," or as the Unilocs describe it, "discretionary." *Ibid.* Fortress's interest here is neither reversionary nor discretionary. It required no "activat[ion]" or invocation. Rather, under the plain language of agreement, the Unilocs *already granted* Fortress the right to use and sublicense the '203 patent on the limitation that Fortress would not

12

*use* the right until an Event of Default. This distinction isn't merely semantic. The bulk of the Federal Circuit's precedent articulating the bounds of "all substantial rights" to identify the patent owner and "exclusionary rights" to determine standing to sue begins with a defendant, *not a party to the agreement*, challenging the legal implications of the allocation of rights between the parties. *See, e.g.*, *Lone Star*, 925 F.3d at 1227–28; *Mann*, 604 F.3d at 1358; *Morrow*, 499 F.3d at 1334–35; *Aspex*, 434 F.3d at 1338. Were we to take *ADP* the step further of barring a defendant not privy to the agreement from questioning the rights *already allocated* under the agreement, we would have to disregard this body of caselaw as well.

Moreover, as explained above, neither waiver, consent, nor contract can manufacture standing. *See Booth*, 990 F.2d at 620; *Diggs*, 670 F.3d at 1355; *cf. Johnson*, 319 U.S. at 305. And, absent some ambiguity, the contracts here speak for themselves. *MHR*, 12 N.Y.3d at 645. This inquiry turns on the facts and the contract terms, not the parties' subjective beliefs.

*Third*, the Unilocs contend that Fortress's license does not divest them of standing to sue retroactively. They claim that the License Agreement granted Fortress only a *prospective* right to grant sublicenses. Such restrictive language appears in neither the Revenue Sharing Agreement nor the Patent License, and the Unilocs cite no decision for the proposition that we should import the limitation. On the contrary, under New York law, "if parties to a contract omit terms — particularly, terms that are readily found in other, similar contracts — the inescapable conclusion is that the parties intended the omission." *Quadrant Structured Products Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560, 16 N.E.3d 1165, 1172 (2014). Absent such a limitation in the text of the agreement, Fortress's licensing rights operate both prospectively and retrospectively.

## CONCLUSION

Uniloc Luxembourg and Uniloc USA's licensing scheme deprived them of exclusionary rights in the '203 patent. This, in turn, deprived them of Article III standing. Such a defect cannot be cured, even via joinder. *Azure*, 771 F.3d at 1347. Apple's motion is **GRANTED**. The Unilocs' motion to join Uniloc 2017 is **DENIED AS MOOT**. To the extent the Court lacked jurisdiction to rule the asserted patent claims invalid, the May 18, 2018, order granting

13

judgment on the pleadings to Apple (Dkt. No. 99) is **VACATED** with the understanding that if this order is vacated or reversed, the order regarding invalidity shall be reinstated.  This case is **DISMISSED**.  The Clerk shall please close the file.

      **IT IS SO ORDERED.**


Dated:  December 4, 2020.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

14

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNILOC USA, INC.; and UNILOC
LUXEMBOURG, S.A.,

        Plaintiffs,

  v.

APPLE INC.,

        Defendant.

_____/

No. C 18-00358 WHA

**ORDER GRANTING
MOTION FOR JUDGMENT
ON THE PLEADINGS**

**INTRODUCTION**

In this patent infringement action, defendant moves for judgment on the pleadings on the basis that the sole asserted patent herein remains directed to patent-ineligible subject matter. The motion is **GRANTED**.

**STATEMENT**

Plaintiffs Uniloc USA, Inc., and Uniloc Luxembourg, S.A. (collectively, "Uniloc"), accuse defendant Apple Inc. of both directly and indirectly infringing U.S. Patent No. 6,661,203 ("the '203 patent"), either literally or under the doctrine of equivalents (Dkt. No. 1 ¶¶ 11, 13).

The '203 patent claims "[a] method and apparatus for controlling the charge and discharge currents in a battery as a function of temperature" (Dkt. No. 1-2, Abstract). As the patent explains, the process of charging or discharging a rechargeable battery generates "a certain amount of internal heat" proportional to the amount of electrical current flowing through the battery. Devices powered by batteries also usually generate heat during operation. The

United States District Court
For the Northern District of California

1  high temperatures potentially caused by the operation of batteries and adjacent circuitry create a

2  "dilemma" for battery designers.  If a designer maintains charge and discharge currents at

3  higher levels with the expectation that the battery will operate at lower temperatures, then

4  battery life and reliability may become compromised if the operating temperature increases.  If,

5  on the other hand, a designer maintains charge and discharge currents at lower levels with the

6  expectation that the battery will operate at higher temperatures, then it may take too long for the

7  battery to complete charging and discharging operations.  The battery could be located "in a

8  cooler environment" or supplemented with "additional cooling equipment" to counteract

9  overheating, but according to the '203 patent this remains "undesirable due to increased cost,

10  greater systems complexity, or reduced reliability," among other things (*id.* at 2:13–57).

11      The '203 patent describes its claimed invention, which purports to solve the foregoing

12  problem, as follows (*id.* at 2:64–3:5):

13          An apparatus for charging a battery according to its
            temperature . . . includes a charging circuit adapted to charge a
14          battery and a temperature sensor positioned to sense a battery
            temperature, i.e., adjacent environmental temperature.  The
15          apparatus includes a controller coupled to the temperature sensor
            and the charging circuit.  The controller operates to set the
16          charging current in accordance with the sensed temperature.

17  The claimed invention never teaches any particular algorithm, parameters, variables, or values

18  for controlling current as a function of temperature.  Despite being dressed up with

19  "illustrative" tables and flow charts presenting hypothetical examples of specific

20  implementation, the '203 patent discloses no inventive source code, formula, or circuitry.

21  Instead, the claimed invention remains limited to the high-level concept described above.  At a

22  similar level of generality, the '203 patent describes several broad "refinements" of the claimed

23  invention — including, as nonexhaustive hypothetical examples, controllers that continuously

24  or periodically set charging currents according to sensed temperatures, controllers that reference

25  memorized tables to set the appropriate currents for specific temperatures, and controllers that

26  set currents at maximum or minimum values (including reducing current flow to zero) based on

27  predetermined threshold temperature values (*see id.* at 3:6–25).

28

United States District Court

For the Northern District of California

Furthermore, the '203 patent expressly acknowledges how the hardware that would be used to implement its claimed invention existed in the prior art.  Specifically, the patent describes at length an "illustrative embodiment" featuring a "smart battery" with which "the present invention is implemented to allow the system to extract maximum performance from the battery without exceeding safe operational constraints for the battery."  According to the patent, the smart battery "industry standard" includes a temperature sensor and a controller with the ability to measure and communicate certain information about the battery's operation, including "terminal voltage, the rate of current flow into or out of the battery, the charges state . . . and the temperature of the battery" (*id.* at 4:41–5:6).  The hardware components may be any of a variety "understood by those possessing ordinary skill in the art" (*id.* at 5:51–60).

To repeat, the '203 patent itself makes clear that both the aforementioned operational constraints of battery design and the hardware used to implement said design predate the claimed invention, which remains limited to the high-level concept of adjusting a battery's current flow based on its temperature.  According to the '203 patent, the claimed invention "allows designers to move closer to the absolute limits" of "operational constraints" known to those skilled in the art while avoiding "deleterious effects" like "reduced battery life, reduced battery capacity, and certain potentials for dangerous situations including overheating, fire, and chemical leakage," and "while still maintaining maximum performance from the battery and the system into which it is installed" (*id.* at 3:61–4:12).

Uniloc alleges Apple products infringe the '203 patent because they "incorporate rechargeable batteries having a temperature sensor that, *inter alia*, causes the device to cease charging when the battery temperature exceeds a threshold level."  Put differently, Apple products charge batteries and use sensors to monitor the temperatures of their batteries to avoid overheating (Dkt. No. 1 ¶¶ 10, 12).  This action originated in the Eastern District of Texas in May 2017 and transferred to our district in January 2018.  It was related to six other patent infringement cases initiated by Uniloc and reassigned to the undersigned judge.

Apple now moves for judgment on the pleadings (Dkt. No. 53).  This order follows full briefing and oral argument.

# ANALYSIS

### 1.    LEGAL STANDARDS.

Federal Rule of Civil Procedure 12(c) provides that, "[a]fter the pleadings are closed —
but early enough not to delay trial — a party may move for judgment on the pleadings."
Analysis under FRCP 12(c) is "substantially identical" to analysis under FRCP 12(b)(6).  Under
both, "a court must determine whether the facts alleged in the complaint, taken as true, entitle
the plaintiff to a legal remedy."  *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).
Both sides agree that the pleading standards set forth by *Bell Atlantic Corporation v. Twombly*,
550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), govern Uniloc's claim for
relief (*see* Dkt. Nos. 53 at 6, 60 at 7–8).

Here, the complaint asserts "at least" claims 1, 8, and 16 of the '203 patent.  In briefing
on the instant motion, Uniloc indicates it also asserts claims 15 and 23 of the '203 patent, which
would appear in its forthcoming disclosures and infringement contentions pursuant to our Patent
Local Rules (*see* Dkt. No. 60 at 1 & n.1).  Apple points out — and Uniloc does not disagree —
that claims 8 and 16 are representative for purposes of the instant motion.  Claim 8 recites (Dkt.
No. 1-2 at 8:1–15 (emphasis added)):

> An apparatus for exercising a battery, comprising
>
>> a charging circuit having a charging current output coupled
>> to the battery;
>>
>> a temperature sensor positioned to sense a temperature
>> related to the battery temperature;
>>
>> a discharging circuit having a discharging current input
>> coupled to the battery; and
>>
>> a controller coupled to said temperature sensor, said
>> charging circuit, and said discharging circuit, said
>> controller operable to set said charging current *in
>> accordance with* said temperature, and operable to set said
>> discharging current *in accordance with* said temperature,
>> said controller being operable to set said discharging
>> current to zero when said temperature is higher than a first
>> predetermined threshold value.

Similarly, claim 16 recites (*id.* at 8:42–49 (emphasis added)):

> A method of charging a battery, comprising the steps of:

4

United States District Court
For the Northern District of California

sensing a temperature related to the battery temperature;

setting a charging current *in accordance with* said sensed temperature and setting said charging current to zero when said temperature is higher than a first predetermined threshold value; and

charging the battery at said charging current.

Section 101 of Title 35 of the United States Code defines patent-eligible subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." Under well-established Supreme Court precedent, laws of nature, natural phenomena, and abstract ideas remain patent-ineligible under Section 101. *See, e.g.*, *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013) (citations and quotations omitted). The Supreme Court has set forth a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." Under this framework, a court must first "determine whether the claims at issue are directed to one of those patent-ineligible concepts." If so, then the court must further "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012)).

**2.    *ALICE* STEP ONE.**

Apple contends the '203 patent remains directed to a patent-ineligible concept — namely, adjusting a battery's current flow based on its temperature (*see* Dkt. No. 53 at 6–13). This order agrees.

Supreme Court precedent that predates *Alice* but nevertheless remains instructive supports Apple's position. For example, *Parker v. Flook* held unpatentable a formula representing "a new and presumably better method for calculating alarm limit values" to signal the presence of abnormal conditions in catalytic conversions of hydrocarbons because the chemical processes involved were well-known, as were "the practice of monitoring the chemical process variables, the use of alarm limits to trigger alarms, the notion that alarm limit

5

values must be recomputed and readjusted, and the use of computers for 'automatic monitoring-alarming,'" and the patent in question did not explain how to manage any specific processes, variables, or alarm systems. *See* 437 U.S. 584, 585–86, 594–95 (1978). *Bilski v. Kappos* held unpatentable "the basic concept of hedging" against the financial risk of price fluctuations in the energy market because risk-hedging was "a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class," and thus an abstract idea. *See* 561 U.S. 593, 598–99, 611–12 (2010). And *Mayo* held unpatentable processes that identified relatively precise correlations between metabolite values in a patient's bloodstream and the likely harm or ineffectiveness of certain dosages of thiopurine drugs because doctors and scientists in the field at the time already generally understood the metabolite-dosage relationship, and the claimed invention amounted to nothing more than recitation of the relationship with the added instruction to "apply it." *See* 566 U.S. at 73–74, 77–80.

The '203 patent does not even disclose a novel formula or algorithm like that in *Flook*, but similarly claims a method for navigating admittedly well-known operational constraints with admittedly industry-standard hardware while supplying no details about how to manage specific values, variables, processes, or systems. As the patent in *Bilski* claimed a basic, fundamental practice long prevalent in economics and finance, the '203 patent here claims a basic, fundamental practice — adjusting electrical current flow to control the heat it generates — long prevalent in physics and engineering. And, like the patent in *Mayo*, the '203 patent essentially recites a well-understood, plainly patent-ineligible relationship — here, electricity and heat instead of thiopurine drug dosages and metabolite values — with the added instruction to "apply it" by monitoring and adjusting one factor in the relationship to control the other. In short, the '203 patent remains directed to a concept at least as well-known and fundamental as the concepts at issue in *Flook*, *Bilski*, and *Mayo*. Those binding precedents held such concepts to be patent-ineligible subject matter, and the same result obtains here.

Uniloc does not address *Flook* or *Bilski* but purports to distinguish *Mayo* on the basis that the claims in *Mayo* "merely covered measuring the [metabolite-dosage] correlation," whereas the asserted claims here "do not recite and are not directed to an expression of the

United States District Court
For the Northern District of California

1   abstract idea that current should be related to temperature," but "require a charging circuit for

2   charging a battery; a temperature sensor to sense a battery temperature; and a controller to

3   control the charging circuit in accordance with the temperature" (*see* Dkt. No. 60 at 12–13).

4   Uniloc's point in reciting the specific components and functions of its claimed invention

5   remains unclear but seems to be that its claimed invention, unlike the one in *Mayo*, does

6   something more than merely "measuring" a natural relationship.

7       *First*, this mischaracterizes the claimed invention in *Mayo*, which not only measured the

8   metabolite-dosage relationship but also explained that low metabolite levels indicated increased

9   drug dosages while high metabolite levels indicated decreased drug dosages — much like how

10  the claimed invention here explains that low temperatures indicate increased electrical current

11  flow while high temperatures indicate decreased electrical current flow.  *See* 566 U.S. at 74–75.

12      *Second*, Uniloc's assertion that its claimed invention is "not directed to an expression of

13  the abstract idea that current should be related to temperature" is plainly false.  The very first

14  sentence of the '203 patent describes the claimed invention as "[a] method and apparatus for

15  controlling the charge and discharge *currents in a battery as a function of temperature*" (Dkt.

16  No. 1-2, Abstract (emphasis added)).  Explanations of the correlation between temperature and

17  current flow, and how to monitor and control the former by manipulating the latter, saturate the

18  rest of the patent and give rise to every advantage claimed by the patent over the prior art.  It

19  beggars belief to suggest that Uniloc's claimed invention, viewed as a whole, has more to do

20  with generic hypothetical assemblies of industry-standard hardware components than with the

21  abstract idea that animates them.

22      Uniloc contends *Diamond v. Diehr*, 450 U.S. 175 (1981), more closely resembles our

23  facts and supports Uniloc's position (*see* Dkt. No. 60 at 10–14).  *Diehr* examined a detailed

24  process invented to mold raw rubber into perfectly-cured products by constantly measuring the

25  temperature inside the mold, repeatedly recalculating the appropriate cure time, and setting the

26  press to open when the calculated cure time equaled actual time elapsed.  Although it calculated

27  appropriate cure time using a well-known equation, the claimed process was new in the art,

28  deviated from conventional industry practice, and solved the longstanding industry problem of

**United States District Court**
For the Northern District of California

7

United States District Court
For the Northern District of California

accounting for the uncontrollable variable of the temperature inside the press in calculating the perfect cure time.  450 U.S. at 177–79.  Under those facts, *Diehr* concluded:

> [W]e think that a physical and chemical process for molding precision synthetic rubber products falls within the § 101 categories of possibly patentable subject matter.  That respondents' claims involve the transformation of an article, in this case raw, uncured synthetic rubber, into a different state or thing cannot be disputed.  The respondents' claims describe in detail a step-by-step method for accomplishing such, beginning with the loading of a mold with raw, uncured rubber and ending with the eventual opening of the press at the conclusion of the cure.  Industrial processes such as this are the types which have historically been eligible to receive the protection of our patent laws.

*Id.* at 184.

Significantly, *Diehr* distinguished *Flook* on the basis that the rubber-curing method in *Diehr* claimed a specific manufacturing process with all its detailed steps instead of seeking to preempt use of an unpatentable formula like that claimed in *Flook*.  *Id.* at 186–87.  In doing so, *Diehr* specifically recognized that limiting an otherwise patent-ineligible concept to a "particular technological environment" or tacking on "insignificant post-solution activity" does not transform said concept into a patentable process.  But if a claimed invention, considered as a whole, performs "a function which the patent laws were designed to protect (*e.g.*, transforming or reducing an article to a different state or thing), then the claim satisfies the requirements of [Section] 101."  *Id.* at 191–92.  As the Federal Circuit put it in *Thales Visionix Inc. v. United States*, another decision cited by Uniloc, "In terms of the modern day *Alice* test, the *Diehr* claims were directed to an improvement in the rubber curing process, not a mathematical formula."  850 F.3d 1343, 1347–48 (Fed. Cir. 2017).

Here, in contrast, Uniloc does not claim a detailed step-by-step method to improve a historically-patentable industrial process that just happens to incorporate a well-known equation at one particular step.  Rather, Uniloc claims sweeping, abstract swaths of possible methods and apparatuses using admittedly industry-standard hardware to implement the patent-ineligible concept that battery designers can adjust a battery's current flow to control its temperature.  On these facts, *Flook*, *Bilski*, and *Mayo* remain the better authorities on point and compel the

United States District Court
For the Northern District of California

1    conclusion that, under *Alice* step one, Uniloc's claims are directed to patent-ineligible subject

2    matter.  This order therefore proceeds to step two.

3        **3.    *ALICE* STEP TWO.**

4        The Supreme Court has described step two as "a search for an inventive concept — *i.e.*,

5    an element or combination of elements that is sufficient to ensure that the patent in practice

6    amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct.

7    at 2355 (quotations and citation omitted).  Apple contends the '203 patent contains no inventive

8    concept sufficient to transform its patent-ineligible subject matter into a patentable invention

9    under *Alice* step two (Dkt. No. 53 at 13–18).  This order agrees.

10        Uniloc makes several attempts to identify an inventive concept in its claimed invention,

11    none persuasive.  *First*, Uniloc compares its claimed invention to that examined in *Thales* (Dkt.

12    No. 60 at 15–16).  This comparison is a nonstarter, since *Thales* found the subject matter in

13    question patent-eligible under *Alice* step one and never reached step two.  *See* 850 F.3d at 1349.

14    But even if *Thales* could be read to apply to *Alice* step two, its analysis — which, as Uniloc

15    points out, closely followed *Diehr* — remains inapplicable to our facts.  *See ibid.* (claims

16    specifying a particular method of using data from a particular "unconventional configuration of

17    sensors" were "directed to a new and useful technique . . . to more efficiently track an object on

18    a moving platform," not to a mathematical equation or other abstract idea).  Contrary to

19    Uniloc's suggestion, the '203 patent teaches no inventive "particular configuration of sensors

20    and method of using the raw data" comparable to that in *Thales* (*see* Dkt. No. 60 at 15–16).

21        *Second*, Uniloc argues that its claims pass the machine-or-transformation test because

22    the claimed invention "includes a temperature sensor that transforms heat into an electronic

23    signal . . . and a controller which sets current flow . . . to and/or from a battery, thereby

24    balancing the internally generated heat temperature with the local environment.  Thus, the

25    [claims] include specific limitations that are beyond what is well understood and conventional

26    in the predicting user future locations field and are beyond generally linking the abstract idea to

27    a computer environment" (*id.* at 16).  This argument is nonsensical.  A temperature sensor does

28    not "transform" heat into electricity.  A controller does not "transform" anything by setting

9

United States District Court
For the Northern District of California

1   current flow as a function of corresponding heat generation.  The asserted claims have nothing

2   to do with "predicting user future locations."  And it remains unclear how the claimed invention

3   does anything beyond "generally linking" an abstract idea to conventional hardware.

4        *Third*, Uniloc contends its claims would not "preempt the fundamental concept of using

5   temperature to control current in a battery" because "[t]he claims are specifically limited to the

6   process of charging or exercising a battery" (*ibid.*).  But Uniloc's own authorities recognize that

7   limiting a patent-ineligible concept to a "particular technological environment" does not

8   produce a patentable process.  *See Diehr*, 450 U.S. at 191–92; *Thales*, 850 F.3d at 1347.  Uniloc

9   asserts in conclusory fashion that "'[c]harging or exercising a battery' is not one field of use out

10  of other possible fields of use [but] is the invention's character" (Dkt. No. 60 at 18).  But this is

11  merely attorney argument.  The gravamen of Uniloc's claimed invention is not the process of

12  charging or exercising a battery but a method or apparatus for improving said process *by*

13  *applying the basic concept that reducing a battery's electrical current flow also reduces its*

14  *temperature*.  The risk of monopolizing a patent-ineligible concept flows from that basic

15  concept, not from the context of battery design.

16       In a similar vein, Uniloc contends its claims would not "preempt" a patent-ineligible

17  concept because "[o]ne could easily contemplate numerous inventions that could use a different

18  temperature to control current in a battery."  For example, Uniloc suggests "one could increase

19  the speed of a *battery* operated fan as ambient temperature increased," "monitor the temperature

20  of an engine and shut it off when it overheated with a *battery* operated circuit," or "actuate a

21  *battery* operated fire suppression system based on a compartment temperature" (emphasis

22  added).  These are counterfeit comparisons, superficially likened to the claimed invention

23  herein by strategic injections of the word "battery" but ultimately irrelevant to the issues at

24  hand.  Insofar as Uniloc implies a meaningful distinction between monitoring *only* battery

25  temperature versus monitoring the temperature of adjacent circuitry, the '203 patent itself belies

26  any such distinction.  As the '203 patent explains, the overheating problem it aims to solve

27  arises from both the battery *and* the "adjacent circuitry" because "a battery may be subjected to

28  heat energy produced by the device it powers as well as the heat the battery produces internally"

Appx0024

1   (Dkt. No. 1-2 at 2:25–33). Consistent with this explanation, and contrary to Uniloc, the '203

2   patent does not limit its claims to sensing *only* battery temperature but also encompasses

3   sensing temperatures "*related to* the battery temperature" (*e.g.*, *id.* at 8:4–5, 44).

4         Or, perhaps Uniloc means to insinuate it could have claimed ownership over an even

5   broader, more abstract concept — for example, *any* approach to operating *any* battery-powered

6   system based on *any* relevant temperature, as opposed to merely adjusting a battery's electrical

7   current flow to prevent overheating *of the battery itself* — so its claimed invention seems

8   relatively modest and reasonable in comparison and should pass scrutiny. This reasoning would

9   be specious. That the '203 patent could have reached even further into patent-ineligible

10   territory does not somehow change the fact that, as it stands, it remains directed to a patent-

11   ineligible concept. And, to repeat, limiting a patent-ineligible concept to a "particular

12   technological environment" or tacking on "insignificant post-solution activity" does not

13   transform it into a patentable process. *See, e.g.*, *Diehr*, 450 U.S. at 191–92.

14         *Fourth*, Uniloc argues that its claimed invention achieves improvements to battery

15   technology relative to "prior art" with different hardware components, like "providing a cooling

16   system" (Dkt. No. 60 at 17). This argument misses the point. The distinction Uniloc points out

17   between its claimed invention and the prior art is not some improvement in hardware

18   configuration but the switch from one underlying concept (adding a cooling system to counter

19   heat generation) to another (reducing electrical current flow to reduce the heat it generates).

20   The bottom line remains that any improvement achieved by Uniloc's claimed invention stems

21   from mere recitation and application of a patent-ineligible concept.

22         In summary, based on the pleadings, Uniloc's claimed invention remains directed to

23   patent-ineligible subject matter and contains no inventive concept sufficient to transform the

24   nature of the claims into a patentable application. Apple is therefore entitled to judgment on the

25   pleadings that the asserted claims in this action are invalid under Section 101 and *Alice*.

26         **4.    TIMING OF MOTION AND LEAVE TO AMEND.**

27         Uniloc insists a factual issue precludes judgment on the pleadings because the parties

28   disagree as to whether or not the claimed invention features "routine and conventional"

11

United States District Court

For the Northern District of California

1    elements like hardware configurations (Dkt. No. 60 at 18–19).  In support of its position, Uniloc

2    cites the recently-issued *Berkheimer v. HP Inc.*, which held that "[t]he question of whether a

3    claim element or combination of elements is well-understood, routine and conventional to a

4    skilled artisan in the relevant field is a question of fact."  881 F.3d 1360, 1368 (Fed. Cir. 2018).

5         *Berkheimer*, however, also reiterated that "not every [Section] 101 determination

6    contains genuine disputes over the underlying facts material to the [Section] 101 inquiry."  It

7    acknowledged that "[w]hether a claim recites patent eligible subject matter is a question of law

8    which . . . has in many cases been resolved on motions to dismiss or summary judgment."  It

9    stressed that "[n]othing in this decision should be viewed as casting doubt on the propriety of

10   those cases."  *Ibid.*  Contrary to Uniloc, the instant motion tees up no factual dispute over

11   whether or not a claim element or combination of elements "is well-understood, routine and

12   conventional to a skilled artisan in the relevant field."  To the extent Uniloc refers to the

13   hardware components and configurations identified in its claims, the '203 patent itself explains

14   that those components and configurations were considered industry standard at the time of the

15   claimed invention.  To the extent Uniloc refers to the concept of adjusting a battery's electrical

16   current flow to control its temperature, that concept, as stated, remains patent-ineligible.

17        Uniloc attempts to manufacture a factual question by arguing that it could get around the

18   aforementioned roadblocks if allowed to proceed on the merits.  This order disagrees.  *First*,

19   Uniloc points out that its claimed invention purports to improve "battery technology, including

20   design, performance, balanced current flow, and long battery life," but those improvements all

21   pertain to *results* — specifically, results flowing from an underlying patent-ineligible concept

22   rather than from any specific hardware configuration disclosed by the '203 patent.  This creates

23   no factual dispute as to the routine and conventional nature of the implementing hardware,

24   which the '203 patent itself reveals.  *Second*, Uniloc inexplicably suggests the industry-standard

25   smart battery described in the '203 patent is not prior art but merely "an illustrative embodiment

26   of the *present invention*" (Dkt. No. 60 at 19 (emphasis in original)).  This suggestion is baseless.

27   Uniloc does not and cannot explain how "industry standard" technology could fall outside the

28   realm of "prior art," or be considered anything other than routine and conventional.

12

United States District Court
For the Northern District of California

1    Uniloc also insists that claim construction issues preclude judgment on the pleadings,

2 but provides no concrete example of any such issue. The closest it comes is in the vague

3 suggestion that "construction of terms like 'controller' and 'circuit' may result in requiring

4 more structure than Apple's analysis permits" (Dkt. No. 60 at 20). But Uniloc never explains

5 how the parties debate the meaning of "controller" or "circuit," much less how the outcome of

6 any such debate could possibly alter the analysis herein.

7    Finally, in the event that Apple's motion is granted, Uniloc seeks leave to amend to

8 expand on "details in the patent that support Uniloc's view that the claims as a whole are not

9 routine and conventional" (Dkt. No. 60 at 20–21). The proposed amendment adds generic

10 allegations to the effect that Uniloc's claimed invention represented a novel solution to a

11 previously-unsolved industry problem (*see* Dkt. No. 60-4). The issue with Uniloc's patent,

12 however, is not limited to "routine and conventional" hardware. Rather, the issue illuminated

13 by this motion is that Uniloc's claimed invention simply recites a patent-ineligible idea as

14 implemented by "industry standard" technology. *See Alice*, 134 S. Ct. at 2359–60 (claims that

15 amount to "nothing significantly more" than an instruction to apply an abstract idea using

16 "some unspecified, generic" technology do not describe a patentable invention). Uniloc's

17 proposed amendment fails to cure this defect, which appears on the face of the '203 patent.

**CONCLUSION**

19    For the foregoing reasons, defendant's motion for judgment on the pleadings is

20 **GRANTED**. Leave to amend is denied as futile. Judgment will follow.

21    Any motion for attorney's fees shall be postponed until completion of at least the first

22 round of the expedited summary judgment procedure set forth by the case management order in

23 the related patent infringement actions.

24

25    **IT IS SO ORDERED.**

26

27 Dated: May 18, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

13

United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNILOC USA, INC.; and UNILOC
LUXEMBOURG, S.A.,

      Plaintiffs,

  v.

APPLE INC.,

      Defendant.

                       /

No. C 18-00358 WHA

**JUDGMENT**

For the reasons stated in the accompanying order granting a motion for judgment on the pleadings (Dkt. No. 99), **FINAL JUDGMENT IS HEREBY ENTERED** in favor of defendant Apple Inc. and against plaintiffs Uniloc USA, Inc., and Uniloc Luxembourg, S.A. The Clerk shall please **CLOSE THE FILE**.

    **IT IS SO ORDERED.**

Dated: May 18, 2018.

                               WILLIAM ALSUP
                               UNITED STATES DISTRICT JUDGE



US006661203B2

(12) **United States Patent**
Wolin et al.

(10) Patent No.: **US 6,661,203 B2**
(45) Date of Patent: **Dec. 9, 2003**

(54) **BATTERY CHARGING AND DISCHARGING SYSTEM OPTIMIZED FOR HIGH TEMPERATURE ENVIRONMENTS**

(75) Inventors: **Dale Wolin**, Boise, ID (US); **Eugene Cohen**, Eagle, ID (US); **Richard G. Sevier**, Boise, ID (US)

(73) Assignee: **Hewlett-Packard Development Company, L.P.**, Houston, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 44 days.

(21) Appl. No.: **10/011,140**

(22) Filed: **Nov. 12, 2001**

(65) **Prior Publication Data**

US 2003/0090238 A1 May 15, 2003

(51) **Int. Cl.**[7] ............................................... **H02J 7/00**

(52) **U.S. Cl.** ...................................... **320/134;** 320/128

(58) **Field of Search** ................................ 320/134, 128, 320/127, 112, 144, 150, 153; 324/426, 427

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,572,110 | A | * | 11/1996 | Dunstan ..................... | 320/106 |
| 5,789,899 | A | * | 8/1998 | van Phuoc et al. ......... | 320/133 |
| 6,160,377 | A | * | 12/2000 | Fujii ........................... | 320/117 |
| 6,271,643 | B1 | * | 8/2001 | Becker et al. ............... | 320/112 |
| 6,286,109 | B1 | * | 9/2001 | Pirdy ......................... | 713/340 |
| 6,366,056 | B1 | * | 4/2002 | Podrazhansky et al. ..... | 320/141 |

* cited by examiner

*Primary Examiner*—Michael Sherry
*Assistant Examiner*—Lawrence Luk

(57) **ABSTRACT**

A method and apparatus for controlling the charge and discharge currents in a battery (2) as a function of temperature. When a battery (2) is charged or discharged in an environment that approaches its design operating temperature extreme, the currents are reduced to limit self-heating of the battery and thus extend the useful operating environment temperature range. A temperature sensor (18) is coupled to a controller (6) to sense the battery (2) temperature. The temperature information is used to set a suitable charging or discharging current (8).

**31 Claims, 2 Drawing Sheets**





*FIG. 1*



*FIG. 2*



*FIG. 3*

US 6,661,203 B2

1

# BATTERY CHARGING AND DISCHARGING SYSTEM OPTIMIZED FOR HIGH TEMPERATURE ENVIRONMENTS

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to apparatus and methods for charging rechargeable batteries. More specifically, the present invention relates to apparatus and method for charging, discharging and recharging rechargeable batteries under adverse thermal conditions.

### 2. Description of the Related Art

Reliable electric power sources are needed to meet the continued growth of electric and electronic business, commercial and personal applications. For portable applications, the chemical storage battery is most commonly employed. For fixed location applications, the public power grid is the most common source of electrical power. Also, alternative sources of power are often employed to produce electric power, such as solar-voltaic, thermal, wind, water and other power sources.

For many applications, a high degree of reliability is required. Although public power grids are highly reliable, these grids are not perfect. Nor are alternative sources of electric power. Therefore, storage batteries are frequently employed in conjunction with, and as a back-up to, the public power grid and alternative sources of electrical power.

Chemical storage batteries have been produced using a variety of technologies. Each technology comprises a number of defining characteristics that should be considered in selecting a suitable technology for a particular application. These include, but are not limited to, size, weight, cost, power density, environmental constraints, voltage, current, power, and so forth.

In many applications, the ability to be recharged is a critical requirement of a chemical storage battery. Recharge-ability reduces cost, extends useful life, and adds reliability to both battery and system design. Some common chemical technologies employed in rechargeable batteries are Nickel-Metal Hydride, Lithium Ion, Lithium Ion Polymer, Lead-Acid, and Nickel Cadmium among other unique and hybrid technologies.

Rechargeable batteries are charged by delivering electric current to positive and negative terminals of the battery for a duration of time sufficient to fully charge the battery. Later, current is drawn from the battery as a power source to some particular device or application.

However, the conditions of charging and discharging are not without limitations. The limitations are typically defined by the battery manufacturer or supplier. In applications where a battery is maintained as a back up to another primary source of electrical power, the battery may rest for long periods of time in a fully charged ("standby") state, awaiting an interruption of the primary power source. When this occurs, the electric power stored in the battery is consumed in lieu of the primary power source.

A chemical battery resting in the standby state for long periods of time may degrade due to various factors. The total power available may be reduced, the terminal voltage may change, and the ability to determine the amount of power available may be compromised.

Smart battery charge algorithms have been developed to alleviate some of the problems associated with long term

2

standby operation of a battery. Such chargers periodically 'condition' the battery by applying an artificial load to discharge the battery to some predetermined level, and then recharge the battery to full charge. During such a condition-ing process, certain metrics may be measured and used to calibrate the battery for later determination of the available power during a battery discharge cycle. It is desirable to process a discharge cycle in as short a period of time as possible so that the battery can quickly be returned to standby operation. Similarly, it is generally desirable to charge a battery as quickly as possible so that it can be readied for use as quickly as possible.

When a battery is being charged or discharged, a certain amount of internal heat is generated as current flows through the battery. This heat is proportional to the amount of current flowing within the battery. In ambient conditions where the amount of heat generated is small compared to the heat loss from the battery, the internal heat generation is usually not significant. Often, a battery is located in close physical proximity to the device it powers or to which it provides standby service. An example of this is occurs when a battery is used to provide standby power to a computing device. In most instances, the device with which the battery operates also generates heat during operation.

Electrical energy discharged from the battery can cause thermal problems at high temperature, for both the battery and the adjacent circuitry. For example, a battery may be subjected to heat energy produced by the device it powers as well as the heat the battery produces internally. In addition, the components adjacent to the battery conditioning circuit (often a resistive load) may be pushed close to thermal limits due to joule heating of the discharge load at high tempera-ture.

In addition, other heat sources in the vicinity of the battery may affect ambient conditions and raise the operating tem-perature of the environment. Thus, it is not uncommon for a battery to be operated at substantially elevated tempera-tures.

When a battery is operating at or near its maximum operating temperature, designers are faced with a dilemma. If the battery charge and discharge currents are maintained at levels normally applied for the lower ranges of expected operating temperatures, the battery life and reliability can be greatly compromised when temperatures become elevated. On the other hand, if the designer takes a conservative approach, and sets the charge and discharge currents at levels consistent with a reasonable maximum operating temperature, then charge and discharge currents may be so low that the time required to accomplish these operations become unacceptably long.

Alternatives presently available to address this dilemma include locating the battery in a cooler environment, usually distant from the device being powered and providing addi-tional cooling equipment. Each of these alternatives is typically undesirable due to increased cost, greater systems complexity, or reduced reliability, inter alia.

Thus there is a need in the art for an apparatus and method for efficiently charging, discharging and recharging batteries in environments with variable thermal conditions.

## SUMMARY OF THE INVENTION

The need in the art is addressed by the apparatus and methods taught by the present invention. An apparatus for charging a battery according to its temperature is taught. The apparatus includes a charging circuit adapted to charge a battery and a temperature sensor positioned to sense a

3

battery temperature, i.e., adjacent environmental temperature. The apparatus includes a controller coupled to the temperature sensor and the charging circuit. The controller operates to set the charging current in accordance with the sensed temperature.

In a refinement, the controller continuously sets the charging current in accordance with the sensed temperature. In a further refinement, the controller periodically sets the charging current in accordance with the sensed temperature. In a further refinement, the apparatus further includes a memory coupled to the controller having a temperature and charging current look up table stored therein. In this embodiment, the controller accesses the look up table to set the charging current. In a further refinement, the controller operates to set the charging current to a maximum value when the temperature is lower than a first predetermined threshold value. In a further refinement, the maximum value is the battery's maximum specified charging current and the first predetermined threshold value is the battery's maximum charging temperature. In a further refinement, the controller sets the charging current to zero when the temperature is higher than a second predetermined threshold value. In a further refinement, the battery is coupled to a load and the temperature sensor senses the temperature of the battery and the load.

The present invention also teaches an apparatus for exercising or conditioning a battery. This apparatus includes the charging circuit and a temperature sensor. Also, a discharging circuit is coupled to the battery while a controller is coupled to the temperature sensor, the charging circuit, and the discharging circuit. The controller operates to set the charging and discharging currents in accordance with temperature.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a functional block diagram of an illustrative embodiment of the present invention.

FIG. 2 is a flow diagram of an illustrative embodiment of the present invention.

FIG. 3 is a flow diagram of an illustrative embodiment of the present invention.

## DESCRIPTION OF THE INVENTION

Illustrative embodiments and exemplary applications will now be described with reference to the accompanying drawings to disclose the advantageous teachings of the present invention.

While the present invention is described herein with reference to illustrative embodiments for particular applications, it should be understood that the invention is not limited thereto. Those having ordinary skill in the art and access to the teachings provided herein will recognize additional modifications, applications, and embodiments within the scope thereof and additional fields in which the present invention would be of significant utility.

The present invention advantageously utilizes a temperature sensor in combination with a battery charger, or a battery conditioner, to control charging and discharging current flow as a function of the battery temperature. As is understood by those skilled in the art, rechargeable batteries are characterized by a number of operational constraints. Among these are terminal and charging voltage, maximum charging current flow, maximum current draw, and a range of environmental constraints, including maximum operation, charging and discharging temperatures. Imple-

4

mentation of a battery in a system that operates outside the bounds of such constraints will lead to a number of deleterious effects. These include reduced battery life, reduced battery capacity, and certain potentials for dangerous situations including overheating, fire, and chemical leakage. Thus, designers strive to maintain operational factors within design constraints. Yet, in certain practical applications, designers are forced to implement batteries in environments that push the limits of these constraints. The present invention allows designers to move closer to the absolute limits, while still maintaining maximum performance from the battery and the system into which it is installed.

As discussed above, a number of chemical technologies are employed in modern rechargeable batteries. Each technology is constrained as noted above. In an illustrative embodiment, a lithium ion battery is employed. Nonetheless, it will be understood by those of ordinary skill in the art that the teachings provided herein are not limited to a particular battery technology.

When a battery is charged or discharged, current flows through the battery and a certain amount of internal heat is produced. When the battery is being charged or discharged in an environment near its maximum operating temperature, the internal heat generated can push the battery beyond it design constraints, leading to the aforementioned deleterious effects. Operating environments that are near a battery's operating extremes are rather common. For example, a battery back-up system for a computing device, such as a computer or mass storage system, is often times located in close proximity to the computing device. The heat produced by the computing device contributes to the heat of the environment that the battery operates within. Also ambient conditions may be warm or hot, exacerbating the thermal environment. There are many other applications that push the thermal constraints, including outdoor, mobile, industrial, non-air conditioned, and other similar environments. The present invention advantageously balances the current flow in the battery, thus balancing the internal heat generation and build-up, with the battery and local environmental temperature.

In an illustrative embodiment, a lithium ion smart battery is employed in a computer storage disk array system and the present invention is implemented to allow the system to extract maximum performance from the battery without exceeding safe operational constraints for the battery.

The Smart Battery industry standard describes one or more battery cells in conjunction with a controlling device that enables the battery to measure and communicate certain information about its operation to a user or an external device. An implementation of a Smart Battery, which is the battery employed in an illustrative embodiment of the present invention, is the Moltech Power Systems model NI2040A17 Rechargeable Lithium Ion Battery, specifications for which are available from Moltech Power Systems, Inc., 12801 NW Highway 441, Alachua, Fla. 32615. This Smart Battery employs lithium ion chemistry in nine storage cells that are arranged in a three by three series-parallel configuration to yield a nominal terminal voltage of 10.8 volts and a power rating of 5000 milli-Ampere hours ("mAhr"). The Smart Battery employs a controller and a "fuel gauge" which is coupled to a display that indicates the battery's power reserve in twenty percent increments. The Smart Battery comprises a thermistor temperature sensor within its housing. The Smart Battery also comprises an SMBus two-wire serial communications port, as is understood by those possessing ordinary skill in the art. The SMBus interface generally applies the industry standard $I^2C$

US 6,661,203 B2

**5**

signaling levels. The SMbus is operable to communicate the smart battery's terminal voltage, the rate of current flow into or out of the battery, the charges state, including whether the battery is fully charged or fully discharged, and the temperature of the battery, according to the aforementioned thermistor temperature sensor. In the illustrative embodiment, the SMBus is coupled to a host controller, as will be more fully described herein after. The illustrative embodiment Smart Battery specifications provide a maximum charge current to 3 amperes at 12.6 volts in the range of temperatures from 0° C. to 45° C. Discharge is rated at 3 amperes from 0° C. to 50° C. Full charge is realized when the charging current drops below 150 milli-amperes.

Reference is directed to FIG. 1, which is a functional block diagram of an illustrative embodiment of the present invention. The aforementioned Smart Battery 2 comprises a plurality of lithium ion cells 24 that are arranged in a series-parallel configuration. A thermistor 18 is located within the battery 2 at a position enabling it to sense the temperature immediately adjacent to the battery cells 24. The thermistor 18 is coupled to a controller 16, which is operable to read the temperature via the thermistor 18. The controller 16 is coupled to a current sensor 20 that enables the controller 16 to monitor the current flow through the battery 2. The controller 16 is also coupled to a voltage sensor 22 that enables the controller 16 to monitor the battery 2 terminal voltage. A fuel gauge 26 is provided that displays the remaining battery capacity, as well as making this information available to the controller 16.

The battery 2 controller 16 is coupled to an SMBus 4 enabling communications of the aforementioned parameters through the SMBus 4. The positive and negative output terminals of battery 2 are coupled though relay 12 to a load, which is a computing device 10 in this illustrative embodiment. A programmable charger 8 is coupled to the battery 2 and enables the supply of charging current to the battery 2. The charger 8 comprises an SMBus interface coupled to SMBus 4, which interface allows the charger 8 to be programmed to deliver a specified current and voltage to the battery 2 for charging thereof. A host controller 6 is coupled to the SMBus 4 and is operable to control the operation of this embodiment of the present invention. The host controller 6 is also coupled 14 to actuate relay 12, which may be accomplished either directly (as shown) or through an SMBus interface (not shown). The host controller 6 may be any of a variety of processors, microprocessors, controllers, microcontrollers, or other programmable devices as are presently understood, or later become available, to those possessing ordinary skill in the art. The host controller includes an amount of random access memory in the illustrative embodiment. The temperature sensor may be a thermistor, a thermocouple, an infrared sensor, or any other sensor having an output proportional to temperature that is understood by those possessing ordinary skill in the art.

The host controller 6 memory is programmed with a look up table of charging and discharging currents related to temperatures. In the illustrative embodiment, these values are determined through empirical measurements. Table 1 below shows illustrative charging current and temperature values:

**6**

TABLE 1

| Temperature | Current |
|---|---|
| Less than 45° C. | 2.0 Amps |
| 45° C. to 55° C. | 1.0 Amps |
| 55° C. to 60° C. | 0.5 Amps |
| Greater then 60° C. | 0.0 Amps |

In operation, the host controller 16 periodically requests the battery temperature from the smart battery 2 and uses this value to access the memory look up table to select a charging current associated with that temperature. By applying these reduced current values, a corresponding reduction in the self-heating of the battery cells is caused by the current flow. This reduction allows the battery to function in a correspondingly warmer environment at the system level. For example, a reduction of the charge current by 50% will reduce the power, and hence the self-heating term, by the square of the charge, or 75%. This readily provides an improvement of 5° C. compared to the battery suppliers recommend extreme temperatures of operation.

As may be expected with respect to the charging cycle, a self-heating term is associated with cell temperatures due to the discharging cycle. When a battery is conditioned, or exercised, the system discharges the battery to a predetermined level. This allows the system to calibrate the battery and assess capacity and useful life, as is understood by those skilled in the art. The battery is then recharged, as discussed above. The discharge rate is reduced in like fashion to the charge rate, thus reducing self-heating and extending the battery's useful life. Also note that the discharge current is directed to a load, such as a resistive load, that converts the battery energy into heat as it is discharged. In the illustrative embodiment, a variable impedance load, under control of the host controller, is employed. A look up table in the memory is used to recall empirically derived factors for suitable discharge current rates, in like fashion with respect to the charging approach. The load is typically located in close proximity to the battery and thus the heat produced affects the battery's environment. The temperature sensor should be positioned to detect this heat, thereby allowing the system to respond accordingly.

Reference is directed to FIG. 2, which is a flow diagram of an illustrative embodiment of a charging operation according to the present invention. The process is called by the host controller at step 30 and proceeds to read the battery temperature at step 32. The battery temperature returned is used to access the look up table in the memory at step 34. The current associated with that temperature is recalled and used to set the output current of the charger at step 36. At step 38, the host controller reads the charge state over the SMBus to determine whether the battery is fully charged or not. If the battery is fully charged at step 38, then the process returns to the calling routine at step 40. On the other hand, if the battery is not fully charged at step 38, then the flow returns to step 32 to repeat the process.

The foregoing describes an operation where the battery temperature is effectively continuously tested by the reiterative loop. In a practical application, it may be preferred to add a fixed time delay because the thermal mass of the battery will prevent sudden jumps in temperature. Thus, the process can readily be adapted from a continuous test to a periodic test, suitable for a given application and environment.

Reference is directed to FIG. 3, which is a flow diagram of an illustrative embodiment of the conditioning, or

US 6,661,203 B2

7

exercise, operation taught by the present invention. The process is called by the host controller at step 50 and proceeds to read the battery temperature at step 52. The battery temperature returned is used to access the look up table in the memory at step 54. The discharge current associated with that temperature is recalled and used to set the load impedance, or discharge current at step 56. At step 58, the host controller reads the charge state over the SMBus to determine whether the battery is fully discharged or not. If the battery is fully discharged at step 58, then the process proceeds to step 60 where the charging process of FIG. 2 is executed. After the charging process is completed, flow returns to the calling routine at step 62 in FIG. 3.

On the other hand, if the battery is not fully discharged at step 58 in FIG. 2, then the flow returns to step 52 to repeat the process. The foregoing describes an operation where the battery temperature is effectively continuously tested by the reiterative loop. In a practical application, it may be preferred to add a fixed time delay because the thermal mass of the battery will prevent sudden jumps in temperature. Thus, the process can readily be adapted from a continuous test to a periodic test, suitable for the application and environment at hand.

Thus, the present invention has been described herein with reference to a particular embodiment for a particular application. Those having ordinary skill in the art and access to the present teachings will recognize additional modifications applications and embodiments within the scope thereof.

It is therefore intended by the appended claims to cover any and all such applications, modifications and embodiments within the scope of the present invention.

What is claimed is:

1. An apparatus for charging a battery comprising

a charging circuit for providing a charging current to the battery;

a temperature sensor positioned to sense a temperature of said battery; and

a controller coupled to said temperature sensor and said charging circuit and operable to control said charging circuit in accordance with said temperature, said controller operable to set said charging current to zero when said temperature is higher than a first predetermined threshold value.

2. The apparatus of claim 1 wherein said controller continuously sets said charging current in accordance with said temperature.

3. The apparatus of claim 1 wherein said controller periodically sets said charging current in accordance with said temperature.

4. The apparatus of claim 1 further comprising a memory coupled to said controller having a temperature and charging current look up table stored therein, and wherein said controller accesses said look up table to set said charging current.

5. The apparatus of claim 1 wherein said controller is operable to set said charging current to a maximum value when said temperature is lower than a second predetermined threshold value.

6. The apparatus of claim 5 wherein said maximum value is the battery's maximum specified charging current, and said second predetermined threshold value is the battery's maximum charging temperature.

7. The apparatus of claim 1 wherein the battery is coupled to a load, and wherein said temperature sensor senses that temperature of the battery and the load.

8

8. An apparatus for exercising a battery, comprising

a charging circuit having a charging current output coupled to the battery;

a temperature sensor positioned to sense a temperature related to the battery temperature;

a discharging circuit having a discharging current input coupled to the battery; and

a controller coupled to said temperature sensor, said charging circuit, and said discharging circuit, said controller operable to set said charging current in accordance with said temperature, and operable to set said discharging current in accordance with said temperature, said controller being operable to set said discharging current to zero when said temperature is higher than a first predetermined threshold value.

9. The apparatus of claim 8 and wherein said controller continuously sets said discharging current in accordance with said temperature.

10. The apparatus of claim 8 and wherein said controller periodically sets said discharging current in accordance with said temperature.

11. The apparatus of claim 8 further comprising a memory coupled to said controller having a temperature versus discharging current look up table stored therein, and wherein said controller accesses said look up table to set said discharging current.

12. The apparatus of claim 11 and wherein said discharging circuit comprises a variable impedance load and wherein said look up table values correspond to values of said variable impedance load.

13. The apparatus of claim 8 and wherein said controller is operable to set said discharging current to a maximum value when said temperature is lower than a second predetermined threshold value.

14. The apparatus of claim 8 wherein said maximum value is the battery's maximum specified discharging current and said second predetermined threshold value is the battery's maximum discharging temperature.

15. The apparatus of claim 8 wherein said temperature sensor senses the temperature of the battery and said discharging circuit.

16. A method of charging a battery, comprising the steps of:

sensing a temperature related to the battery temperature;

setting a charging current in accordance with sensed temperature and setting said charging current to zero when said temperature is higher than a first predetermined threshold value; and

charging the battery at said charging current.

17. The method of claim 16 and wherein said sensing and setting steps are repeated continuously during said charging step.

18. The method of claim 16 and wherein said sensing and setting steps are repeated periodically during said charging step.

19. The method of claim 16 and wherein said setting step further comprises the step of recalling a charging current corresponding to said sensed temperature from a look up table.

20. The method of claim 16 and wherein set setting step includes setting said charging current to a maximum value if said temperature is lower than a second predetermined threshold.

21. The method of claim 20 and wherein said maximum value is the battery's maximum specified charging current, and said second predetermined threshold is the battery's maximum charging temperature.

US 6,661,203 B2

**9**

22. The method of claim **16** wherein the battery is coupled to a load, and wherein said sensing step includes sensing the temperature of the battery and the load.

23. A method of exercising a battery, comprising the steps of:

sensing a temperature related to the battery temperature;

setting a discharging current in accordance with said temperature;

discharging the battery at said discharging current;

discontinuing said discharging step when a predetermined battery voltage is reached;

setting a charging current in accordance with said temperature, said setting step further including the step of setting said discharging current to zero when said temperature is higher than a first predetermined threshold value; and

charging the battery at said charging current.

24. The method of claim **23** and wherein said sensing and setting a discharge current steps are repeated continuously during said discharging step.

25. The method of claim **23** and wherein said sensing and setting a discharge current steps are repeated periodically during said discharging step.

26. The method of claim **23** and wherein said setting step further comprises the step of recalling a discharging current corresponding to said sensed temperature from a look up table.

27. The method of claim **23** and wherein said setting step includes setting said discharging current to a maximum value if said temperature is lower than a second predetermined threshold.

28. The method of claim **27** and wherein said maximum value is the battery's maximum specified discharging current, and said second predetermined threshold is the battery's maximum discharging temperature.

29. The method of claim **23** wherein the battery is coupled to a load, and wherein said sensing step includes sensing the temperature of the battery and the load.

**10**

30. An apparatus for exercising a battery, comprising

a charging circuit having a charging current output coupled to the battery;

a temperature sensor positioned to sense a temperature related to the battery temperature;

a discharging circuit having a discharging current input coupled to the battery; and

a controller coupled to said temperature sensor, said charging circuit, and said discharging circuit, said controller operable to set said charging current in accordance with said temperature, and operable to set said discharging current in accordance with said temperature, said controller being operable to set said discharging current to a maximum value when said temperature is lower than a first predetermined threshold value, said maximum value being the battery's maximum specified discharging current, and said first predetermined threshold value being the battery's maximum discharging temperature.

31. A method of exercising a battery, comprising the steps of:

sensing a temperature related to the battery temperature;

setting a discharging current in accordance with said temperature;

discharging the battery at said discharging current;

discontinuing said discharging step when a predetermined battery voltage is reached;

setting a charging current in accordance with said temperature, said setting step further including the step of setting said discharging current to a maximum value if said temperature is lower than a first predetermined thresholds said maximum value being the battery's maximum specified discharging current and said first predetermined threshold value being the battery's maximum discharging temperature; and

charging the battery at said charging current.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** <u>21-1572</u>

**Short Case Caption:** <u>Uniloc USA, Inc. v. Apple Inc.</u>

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑  the filing has been prepared using a proportionally-spaced typeface and includes <u>13,999</u> words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>05/25/2021</u>

Signature: <u>/s Jeffrey A. Lamken</u>

Name: <u>Jeffrey A. Lamken</u>